**No. 25-2662**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY,

Plaintiffs-Appellees,

v.

PRESIDENT UNITED STATES OF AMERICA; SECRETARY UNITED
STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED
STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
SECRETARY UNITED STATES DEPARTMENT OF TREASURY; UNITED
STATES DEPARTMENT OF TREASURY; SECRETARY UNITED STATES
DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF LABOR;
UNITED STATES OF AMERICA,

Defendants-Appellants,

and

LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,

Intervenor-Defendant-Appellant.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

## BRIEF FOR THE FEDERAL APPELLANTS

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

SHARON SWINGLE
DEREK WEISS
JACOB CHRISTENSEN
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7320*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 616-5365*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................1

STATEMENT OF JURISDICTION...........................................................5

STATEMENT OF THE ISSUES..............................................................5

STATEMENT OF RELATED CASES ......................................................5

STATEMENT OF THE CASE ...............................................................6

    A.    The Affordable Care Act and the Contraceptive-Coverage Mandate ...................................................6

    B.    Challenges to the Contraceptive-Coverage Mandate and Accommodation ...............................................9

    C.    The Interim and Final Rules .............................................12

    D.    The States' Challenges to the Rules....................................14

    E.    Supreme Court's Decision in *Little Sisters* ...........................15

    F.    District Court Proceedings on Remand.................................16

SUMMARY OF ARGUMENT ..............................................................19

STANDARD OF REVIEW...................................................................23

ARGUMENT ................................................................................25

I.    The Religious-Exemption Rule Is Reasonable And Reasonably Explained....................................................25

A.   The Agencies Reasonably Adopted The Religious Exemption As The Better Policy, As Fully Explained In The Rulemaking. .................................................. 25

B.   While The Court Need Not Consider The Agencies' Alternative Explanation, RFRA Does Require A Broader Exemption In Some Cases. ..................................... 34

C.   The Exemption Reasonably Includes Public Companies With Sincere Religious Objections. ...................................... 41

D.   The Process To Obtain An Exemption Is Reasonable. ......... 43

E.   The Agencies Reasonably Explained Their Changes of Position. ............................................................... 45

F.   The Agencies Considered Reasonable Alternatives. ............ 54

II.   The Moral-Exemption Rule Is Reasonable And Reasonably Explained. ........................................................................ 57

A.   Moral Objections Are A Permissible Consideration. ............ 58

B.   The Moral-Exemption Rule Is Reasonably Explained. ........ 61

III.   In Any Event, Universal Vacatur Was Improper. ......................... 62

CONCLUSION .................................................................... 68

COMBINED CERTIFICATIONS

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*American Sch. of Magnetic Healing v. McAnnulty,*
   187 U.S. 94 (1902) .................................................................. 64

*Bostock v. Clayton County,*
   590 U.S. 644 (2020) ............................................................... 60

*Burwell v. Hobby Lobby Stores, Inc.,*
   573 U.S. 682 (2014) ................................. 1, 9–10, 29, 36, 37, 41–42, 60

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ............................................................... 66

*California v. Texas,*
   593 U.S. 659 (2021) ............................................................... 66

*Casino Airlines, Inc. v. National Transp. Safety Bd.,*
   439 F.3d 715 (D.C. Cir. 2006) ........................................... 34

*Comite' De Apoyo A Los Trabajadores Agricolas v. Perez,*
   774 F.3d 173 (3d Cir. 2014) ............................................... 64

*Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.,*
   603 U.S. 799–43 (2024) ....................................................... 63

*eBay Inc. v. MercExchange, L.L.C.,*
   547 U.S. 388 (2006) ....................................................... 66–67

*Eid v. Thompson,*
   740 F.3d 118 (3d Cir. 2014) ........................................... 23–24

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016) ................................................... 24, 30, 46

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ..................................................... 30, 46

*FERC v. Electric Power Supply Ass'n,*
   577 U.S. 260 (2016) ................................................... 24, 30, 33

*Geneva College v. Secretary, HHS,*
  778 F.3d 422 (3d Cir. 2015) ........................................... 39–40

*Gill v. Whitford,*
  585 U.S. 48 (2018) ........................................................ 67

*Hapner v. Tidwell,*
  621 F.3d 1239 (9th Cir. 2010) ........................................ 42

*Hecht Co. v. Bowles,*
  321 U.S. 321 (1944) ...................................................... 65

*HHS v. CNS Int'l Ministries,*
  2016 WL 2842448 (U.S. May 16, 2016) ............................ 37

*In re Yellow Corp.,*
  152 F.4th 491 (3d Cir. 2025) ........................................... 3

*Kleissler v. U.S. Forest Serv.,*
  183 F.3d 196 (3d Cir. 1999) ........................................... 53

*Li Hua Yuan v. Attorney Gen. of U.S.,*
  642 F.3d 420 (3d Cir. 2011) ........................................... 54

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
  591 U.S. 657 (2020) .................................................. passim

*Mail Order Ass'n of Am. v. USPS,*
  2 F.3d 408 (D.C. Cir. 1993) ............................................ 35

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.,*
  463 U.S. 29 (1983) ........................................................ 24

*National Ass'n of Home Builders v. EPA,*
  682 F.3d 1032 (D.C. Cir. 2012) ....................................... 53

*New Jersey Bd. of Pub. Utils. v. FERC,*
  744 F.3d 74 (3d Cir. 2014) ............................................. 24

*NIH v. APHA,*
  145 S. Ct. 2658 (2025) ................................................... 61

*Pennsylvania v. President U.S.*,
  930 F.3d 543 (3d Cir. 2019) ........................................... 6, 15

*Pennsylvania v. Trump*,
  351 F. Supp. 3d 791 (E.D. Pa. 2019) .................................. 15

*Priests for Life v. U.S. Dep't of Health & Hum. Servs.*,
  808 F.3d 1 (D.C. Cir. 2015)..................................... 36, 37, 38

*Real Alternatives, Inc. v. Secretary, HHS*,
  867 F.3d 338 (3d Cir. 2017) ............................................. 40

*Ricci v. DeStefano*,
  557 U.S. 557 (2009) ..................................................... 38–39

*Ron Peterson Firearms, LLC v. Jones*,
  760 F.3d 1147 (10th Cir. 2014) ...................................... 56-57

*Sharpe Holdings v. HHS*,
  801 F.3d 927 (8th Cir. 2015) ............................................ 36

*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024) ....................................................... 65

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.*,
  450 U.S. 707 (1981).............................................. 36–37, 52

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ....................................................... 66

*United States v. Safehouse*,
  146 F.4th 315 (3d Cir. 2025) ....................................... 41–42

*United States v. Texas*,
  599 U.S. 670 (2023) .............................................. 63, 64, 65

*Walz v. Tax Comm'n*,
  397 U.S. 664 (1970) ....................................................... 39

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ....................................................... 65

*Zubik v. Burwell*,
578 U.S. 403 (2016) (per curiam) .................................. 1, 2, 10–11, 39


**Statutes:**                                                    **Page(s)**

Dictionary Act,
1 U.S.C. § 1 ..................................................................... 41

Administrative Procedure Act,
5 U.S.C. § 702 ........................................................... 63, 65
5 U.S.C. § 703 ........................................................... 63, 64
5 U.S.C. § 706 ....................................................... 17, 35, 64

Internal Revenue Code,
26 U.S.C. § 4980D .......................................................... 43
26 U.S.C. § 4980H ....................................................... 9, 43
26 U.S.C. § 9833 .............................................................. 1

Title 28, Judiciary and Judicial Procedure,
28 U.S.C. § 1291 .............................................................. 5
28 U.S.C. § 1331 .............................................................. 5

Title 29, Labor,
29 U.S.C. § 1191c ............................................................ 1
29 U.S.C. § 1132 ............................................................ 44
29 U.S.C. § 1185d .......................................................... 44

Affordable Care Act,
42 U.S.C. § 300gg-13 ...................... 1, 2, 6, 14, 15, 16, 55
42 U.S.C. § 300gg-22 ................................................ 43–44
42 U.S.C. § 300gg-92 ........................................................ 1
42 U.S.C. § 18011 ............................................................. 8

Religious Freedom Restoration Act,
42 U.S.C. § 2000bb-1 ............................ 2, 9–11, 32–33, 36, 41

**Rules and Regulations:**                                    **Page(s)**

*Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act,*
83 Fed. Reg. 57,536 (Nov. 15, 2018) (JA410)................................ passim

*Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act,*
83 Fed. Reg. 57,592 (Nov. 15, 2018) (JA465).............................. passim

*Promoting Free Speech and Religious Liberty,*
Exec. Order No. 13798, 82 Fed. Reg. 21,675 (May 9, 2017) ............... 26

44 Fed. Reg. 75,167 (Dec. 19, 1979) ....................................... 42

81 Fed. Reg. 47,741 (July 22, 2016) ....................................... 11

88 Fed. Reg. 7,236 (Feb. 2, 2023) .......................................... 56

89 Fed. Reg. 106,393 (Dec. 30, 2024) ..................................... 56

45 C.F.R. § 147.131 ........................................................ 29

## INTRODUCTION

The Affordable Care Act (ACA) requires certain employers to cover "preventive care." 42 U.S.C. § 300gg-13(a). Rather than providing a definition, Congress authorized the administering agencies to "provid[e] for" what that term means "in comprehensive guidelines." *Id.* § 300gg-13(a)(4); *see also id.* § 300gg-92; 29 U.S.C. § 1191c; 26 U.S.C. § 9833. Under that "extraordinarily broad general directive," *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 676 (2020) (cleaned up), the agencies included "contraceptive methods" as a type of preventive care, JA700. Since then, the contraceptive-coverage mandate has been subject to nearly continuous litigation. *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014); *Zubik v. Burwell*, 578 U.S. 403 (2016) (per curiam); *Little Sisters*, 591 U.S. 657.

In 2017 and 2018, the agencies broadly revisited their approach to the contraceptive-coverage mandate, promulgating an expanded religious exemption and a new moral exemption. *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 83 Fed. Reg. 57,536 (Nov. 15, 2018) (JA410) (religious-exemption rule); *Moral Exemptions and Accommodations for*

*Coverage of Certain Preventive Services Under the Affordable Care Act*, 83 Fed. Reg. 57,592 (Nov. 15, 2018) (JA465) (moral-exemption rule). The agencies had many reasons to do so. As the agencies articulated, the combination of an exemption and optional accommodation was better policy than the accommodation alone. The exemptions would also end the ongoing litigation about whether the existing accommodation process violated the Religious Freedom Restoration Act (RFRA), *see Zubik*, 578 U.S. 403, and would certainly cure any conflict between the contraceptive-coverage mandate and that Act. The moral exemption would also further the government's legitimate interest in honoring moral objections to contraceptive coverage—an interest that underlies many statutory moral exemptions in other contexts.

In 2019, the district court enjoined the final rules as contrary to law and procedurally invalid. After this Court affirmed, the Supreme Court reversed on both counts. The Supreme Court observed that the ACA "is completely silent as to *what* those 'comprehensive guidelines' must contain." *Little Sisters*, 591 U.S. at 676 (quoting 42 U.S.C. § 300gg-13(a)(4)). It reasoned that "[t]his means that [the agencies] ha[ve] virtually unbridled discretion to decide what counts as

2

preventive care." *Id.* And it explained that this "same capacious grant of authority" also leaves the agencies' "discretion equally unchecked in other areas, including the ability to identify and create exemptions from its own Guidelines." *Id.* In sum, the Supreme Court concluded that "the ACA gives [the agencies] broad discretion to define preventive care and screenings and to create the religious and moral exemptions." *Id.* at 677.

On remand, then, all that was left for the district court was to consider whether the religious and moral exemptions are "so outside the zone of reasonableness that" they "flun[k] [this Court's] deferential review of agency policymaking." *In re Yellow Corp.*, 152 F.4th 491, 504 (3d Cir. 2025) (cleaned up).

The district court once again ruled against the agencies, this time by flipping what should have been a deferential arbitrary-and-capricious review on its head, ignoring what the agencies actually did, and circumventing the Supreme Court's decision by dressing up old (and rejected) arguments in new garb. *First*, the district court substituted its own judgment to override the agencies' choices. In particular, despite the agencies explaining they were broadly revisiting

3

their approach and doing more than merely resolving ongoing RFRA
litigation, the district court nonetheless imposed its own preferred,
narrower objective—resolving RFRA violations remaining under the
accommodation process—and held that anything broader was
impermissible.  *Second*, the district court made multiple factual errors,
faulting the agencies for failing to do things the agencies had done—like
consider ways to "deliver contraceptive coverage independent and
separate from the objecting employer's plan," JA419—and criticizing
the agencies for doing things they never did.  And *third*, the district
court repackaged contrary-to-law arguments already rejected by the
Supreme Court as arbitrary-and-capricious challenges.  Despite the
Supreme Court's holding that the ACA confers broad discretion
authorizing the agencies to exempt moral objectors, *Little Sisters*, 591
U.S. at 676–77, the district court (bafflingly) held that moral objections
were an unlawful consideration.

Enough is enough.  The Supreme Court held that the agencies
have broad discretion under the ACA to make these exemptions,
regardless of whether required by RFRA.  The agencies' reasonable
exercises of that discretion easily satisfy the deferential arbitrary-and-

capricious standard under the Administrative Procedure Act (APA), and the district court should be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331.  The district court granted summary judgment for plaintiffs on their arbitrary-and-capricious claim and vacated the challenged rules on August 13, 2025.  JA5; JA7.  The government timely appealed on August 26, 2025.  JA3.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the religious-exemption rule is arbitrary and capricious in violation of the APA.  (Ruled on at JA36–48, JA51–55).

2.  Whether the moral-exemption rule is arbitrary and capricious in violation of the APA.  (Ruled on at JA48–55).

3.  If either rule is arbitrary and capricious, whether the district court erred in vacating the rules in their entirety.  (Ruled on at JA55–61).

## STATEMENT OF RELATED CASES

The Supreme Court reversed this Court's prior ruling affirming a preliminary injunction in this case.  *See Little Sisters of the Poor Saints*

*Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020), *rev'g*

*Pennsylvania v. President U.S.*, 930 F.3d 543 (3d Cir. 2019).  Similar

challenges to the rules are pending in other courts:  *Massachusetts v.*

*HHS*, No. 21-1076 (1st Cir.); and *California v. HHS*, No. 17-cv-5783

(N.D. Cal.).

## STATEMENT OF THE CASE

### A.    The Affordable Care Act and the Contraceptive-Coverage Mandate

The Affordable Care Act requires most group health plans and

health-insurance issuers that offer group or individual health coverage

to provide coverage for certain preventive services without "any cost

sharing requirements."  42 U.S.C. § 300gg-13(a).  The Act does not

specify the types of women's preventive care that must be covered.

Instead, as relevant here, the Act requires coverage, "with respect to

women," of such "additional preventive care and screenings … as

provided for in comprehensive guidelines supported by the Health

Resources and Services Administration" (HRSA), a component of the

Department of Health and Human Services.  *Id.* § 300gg-13(a)(4).  The

statute confers "virtually unbridled discretion" on HRSA "to decide

what counts as preventive care and screenings." *Little Sisters*, 591 U.S. at 676.

In 2011, HRSA issued guidelines adopting the recommendation of the Institute of Medicine to require coverage of, among other things, all FDA-approved contraceptive methods. *See* JA700. At the same time, the agencies promulgated rules authorizing HRSA to exempt churches and their integrated auxiliaries from the contraceptive-coverage mandate. *See* JA700; JA708. Although various commenters urged the agencies to expand the exemption to all organizations with religious or moral objections to providing contraceptive coverage, *see* JA674–75, the agencies instead offered, in a later rulemaking, what they termed an "accommodation" limited to religious not-for-profit organizations with religious objections to providing contraceptive coverage, *see* JA645–53. The accommodation allowed a group health plan established or maintained by an eligible objecting employer to opt out of any requirement to directly "contract, arrange, pay, or refer for contraceptive coverage." JA645. That opt-out then generally required the employer's health insurer or third-party administrator (in the case

of self-insured plans) to provide or arrange payments for contraception for plan participants.  *See* JA646–51.

In the case of self-insured church plans, however, provision of or payment for contraception by the plan's third-party administrator under the accommodation was voluntary.  Church plans are exempt from the Employee Retirement Income Security Act of 1974 (ERISA), and the authority to enforce a third-party administrator's obligation to provide separate contraceptive coverage derives solely from ERISA. The agencies thus could not require the third-party administrators of those plans to provide or arrange for such coverage, nor impose fines or penalties for failing to do so.  *See* JA633 n.8.

The ACA itself also exempted other employers from the contraceptive-coverage mandate.  The Act exempts from many of its requirements, including the preventive-services requirement, so-called grandfathered health plans (generally, those plans that have not made certain specified changes since the Act's enactment), *see* 42 U.S.C. § 18011; as of 2017, those plans covered tens of millions of people, *see* JA509 & n.5.  And employers with fewer than 50 employees are not subject to the tax imposed for failing to offer health coverage, *see*

26 U.S.C. § 4980H, although small employers that provide non-grandfathered coverage must comply with the preventive-services requirement.

### B. Challenges to the Contraceptive-Coverage Mandate and Accommodation

Many employers objected to the contraceptive-coverage mandate HRSA's guidelines imposed. In *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), the Supreme Court held that RFRA prohibited applying the mandate to closely held for-profit corporations with religious objections to providing contraceptive coverage. The Court held that the "mandate impose[d] a substantial burden on the exercise of religion" for such employers, *id.* at 726, and that, even assuming a compelling governmental interest, application of the mandate was not the least-restrictive means of furthering that interest, *id.* at 727–28. The agencies had already established an accommodation for not-for-profit employers, and, at a minimum, this less-restrictive alternative could be extended to closely held for-profit corporations with religious objections. *Id.* at 730–31. But, although the Court held that such an option was a less-restrictive means under RFRA, the Court did not

decide "whether an approach of this type complies with RFRA for purposes of *all* religious claims." *Id.* at 731 (emphasis added).

In response, the agencies promulgated rules extending the accommodation to closely held for-profit entities with religious objections to providing contraceptive coverage. *See* JA595–600. Numerous entities, however, continued to challenge the mandate, arguing the accommodation burdened their religious exercise because they sincerely believed that the required notice and the provision of contraception in connection with their health plans made them complicit in providing such contraception.

A circuit split developed, *see* JA513, and the Supreme Court granted certiorari. After argument, the Court vacated the judgments and remanded to the respective courts of appeals. *Zubik v. Burwell*, 578 U.S. 403 (2016) (per curiam). The Court "d[id] not decide whether [the plaintiffs'] religious exercise ha[d] been substantially burdened, whether the Government ha[d] a compelling interest, or whether the current regulations [we]re the least restrictive means of serving that interest." *Id.* at 409. Instead, the Court directed that the parties be given an opportunity to resolve the dispute. *Id.* at 408. In the

meantime, the Court precluded the government from "impos[ing] taxes or penalties on [the plaintiffs] for failure to provide the [notice required under the accommodation]." *Id.* at 409. Similar orders were entered in other pending cases.

In response to *Zubik*, the agencies sought public comment to determine whether a modified accommodation could resolve religious objections while providing a mechanism for the employees of objecting organizations to obtain contraception at no cost. *See* 81 Fed. Reg. 47,741 (July 22, 2016). The agencies received over 54,000 comments, but, as they announced on January 9, 2017, the agencies could not find a way to amend the accommodation to both satisfy objecting organizations and provide contraception at no cost to their employees. *See* JA576–86. The pending litigation—more than three dozen cases brought by over 100 plaintiffs—thus remained unresolved.

In addition, some organizations with moral objections to providing contraceptive coverage had filed suits challenging the mandate. That litigation also led to conflicting judicial decisions. *See* JA556.

## C.    The Interim and Final Rules

Faced with this impasse, the agencies "exercised [their] discretion to reevaluate these exemptions and accommodations." JA508. In addition to considering the ongoing RFRA litigation, *e.g.,* JA508; JA514, the agencies reevaluated the "interests served by the existing" regulations, conscience protections in other areas of federal law, the discretion afforded the agencies under the ACA, and the numerous comments previously submitted, JA508. The agencies then issued two interim final rules extending exemptions to additional entities with sincere religious or moral objections to providing contraceptive coverage. JA507–50; JA551–75. Based on their reevaluation, the agencies determined that allowing entities with sincere religious objections to the contraceptive-coverage mandate an exemption and a choice whether to use the existing accommodation was "the most appropriate" regulatory approach, even for those entities that did not have RFRA objections to the existing accommodation. *See* JA514.

After soliciting public comments for 60 days and considering the comments received, the agencies promulgated final rules. *See* JA410–64; JA465–504.

12

Like the interim final rules, the final rules expand the religious exemption to nongovernmental plan sponsors, as well as institutions of higher education in their arrangement of student health insurance coverage, to the extent that those entities have sincere religious objections to providing contraceptive coverage.  JA432–39.  The final rules also exempt entities (except publicly traded companies) with sincere moral objections to such coverage.  JA487–94.  Both rules retain the accommodation as a voluntary option.[1]  *See, e.g.*, JA411–12.  And both rules finalize an "individual exemption" that allows—but does not require—willing employers and insurers to offer plans omitting contraceptive coverage to individuals with religious or moral objections to such coverage.  *See, e.g.*, JA441–43.  The final religious-exemption rule reiterates that, even if not necessary to resolve RFRA violations, "an expanded exemption rather than the existing accommodation is the

---

[1] Under the prior rules, entities with sincere religious objections could use the accommodation as a method of complying with the contraceptive-coverage mandate.  JA511.  Under the challenged rules, entities with religious and moral objections are exempt from the contraceptive-coverage mandate but may still elect to use the accommodation.

most appropriate administrative response to the substantial burden identified by the Supreme Court in *Hobby Lobby*." JA418–19.

The agencies reasoned that Congress granted HRSA discretion to determine the content and scope of any preventive-services guidelines adopted under 42 U.S.C. § 300gg-13(a)(4). *See* JA414–16. They noted that "[s]ince 2011" the agencies "have promulgated regulations to guide HRSA in exercising its discretion to allow exemptions." JA413. And "[b]ecause of the importance of the religious liberty values" and "the limited impact of these rules," the agencies concluded that the expanded exemptions "are good policy." JA426. The agencies also took into account "Congress's long history of providing exemptions for moral convictions, especially in certain health care contexts," JA471; state "conscience protections," JA474; and "the litigation surrounding the [m]andate," JA475.

### D.   The States' Challenges to the Rules

Pennsylvania brought suit challenging the interim final rules. Following issuance of the final rules, New Jersey joined Pennsylvania's suit, and the States filed an amended complaint alleging that the final rules violate equal protection; Title VII of the Civil Rights Act and the

14

Pregnancy Discrimination Act; APA notice-and-comment requirements; APA substantive requirements on the ground the rules violate the ACA and cannot be justified by RFRA; APA requirements to provide an adequate rationale for the rules that is not arbitrary and capricious; and the Establishment Clause.  JA157–62.

The district court granted a nationwide preliminary injunction, concluding the final rules were procedurally invalid because the agencies had not followed notice-and-comment procedures in issuing the interim final rules and were substantively unlawful because neither the ACA nor RFRA authorized the exemptions.  *Pennsylvania v. Trump*, 351 F. Supp. 3d 791 (E.D. Pa. 2019).  This Court affirmed. *Pennsylvania v. President U.S.*, 930 F.3d 543 (3d Cir. 2019).

### E.     Supreme Court's Decision in *Little Sisters*

The Supreme Court reversed, holding that the challenged rules were both authorized by statute and procedurally valid.  *Little Sisters*, 591 U.S. 657.  The Court held that 42 U.S.C. § 300gg-13(a)(4) gives HRSA "virtually unbridled discretion to decide what counts as preventive care and screenings" and similarly "broad discretion" "to create the religious and moral exemptions" to the contraceptive-

15

coverage mandate. *Id.* at 676–77. And although the Court did not

decide whether "RFRA independently compelled the [agencies'] solution

or that it at least authorized it," the Court made clear that "it was

appropriate for the [agencies] to consider RFRA" in issuing the final

rules. *Id.* at 680.

The Supreme Court also held that the final rules complied with

the APA's procedural requirements. *Id.* at 683–86. The Court

remanded for further proceedings. *Id.* at 687.

### F.    District Court Proceedings on Remand

On remand, the district court held that the challenged final rules

are arbitrary and capricious and vacated them in their entirety.[2] JA7

(opinion); JA5 (order).

Starting with the religious exemption, the district court

characterized the problem the agencies sought to address as curing any

remaining RFRA violations not resolved by the accommodation, then

concluded that goal was "not rationally connected" to the choices the

---

[2] The district court granted summary judgment to the federal
defendants on the claims the Supreme Court had addressed and
dismissed plaintiffs' remaining claims at their request. JA6; *see* JA20
n.14; JA23 n.11. Those rulings are not challenged.

agencies made.  JA43; *see* JA37–43.  The court considered it
unreasonable for the agencies to do any more than "extend exemptions
just to those who still maintained sincerely held, complicity-based
objections to the Accommodation."  JA40.  The court also deemed the
rule to be overinclusive in extending the exemption to publicly traded
corporations, which were "unlikely" to have religious objections.  JA41–
42.  And it faulted the agencies for continuing the policy of not requiring
religious objectors to file a notice or self-certification of their religious
objections in order to use the exemption.  JA42–43.

The district court also rejected the agencies' position that RFRA
required the religious rule for "religious objectors who maintained
complicity-based objections to the [a]ccommodation."  JA43–48.
Purporting to rely on "binding Third Circuit precedent," the court held
that requiring an employer to self-certify under the accommodation
does not substantially burden religious exercise.  JA44.  The district
court thus concluded that "to the extent that the Agencies' reason for
promulgating the" religious rule was "motivated by an erroneous
conclusion that RFRA compelled as much," it "must be 'set aside.'"
JA48 (quoting 5 U.S.C. § 706).

17

Turning to the moral exemption, the district court held it was unlawful for HRSA to consider moral objections. The court dismissed the Supreme Court's decision in *Little Sisters*, 591 U.S. at 677, that "the ACA gives HRSA broad discretion to define preventive care and screening and to create the religious and *moral* exemptions" as "tangential to the question before the [district court]." JA49. The district court reasoned that nothing in the ACA affirmatively says the agencies "may consider moral objections." JA48. And it relied on a later Congress's *rejection* of an amendment to the Women's Health Amendment that "would have allowed for moral objections" to conclude "moral objections are a factor which Congress did not intend for the agencies to consider." JA48–51 (alterations adopted and quotation marks omitted).

The district court also held that both final rules were invalid for the additional reasons that the agencies did not adequately explain their "change in course regarding contraception's safety and efficacy" and also "failed to adequately address reasonable alternatives" to the final rules. JA51; *see* JA51–55. Specifically, the court pointed to the proposal in a 2023 notice of proposed rulemaking, which would have

made free contraceptive coverage available to women of exempt organizations without the plan sponsor or issuers having to take any action, as an alternative the agencies were required to consider.  JA54–55.

Finally, the district court rejected the agencies' arguments for a narrower remedy and instead vacated the rules *in toto*.  JA56–61.

## SUMMARY OF ARGUMENT

The Affordable Care Act (ACA) gives the agencies "virtually unbridled discretion to decide what counts as preventive care and screenings" and similarly "broad discretion" "to create the religious and moral exemptions" to the contraceptive-coverage mandate.  *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 676–77 (2020).  The religious-exemption rule and moral-exemption rule are reasonable exercises of this broad discretion and are reasonably explained.

The Supreme Court rejected the district court's two earlier reasons for enjoining the rules.  *Little Sisters*, 591 U.S. 657.  On remand, the district court gave seven new reasons to vacate the rules— reasons that defy both the deferential arbitrary-and-capricious

19

standard and the Supreme Court's recognition of the agencies' broad discretion to define exemptions from the preventive care requirement.

First, the district court said the agencies failed to provide a satisfactory explanation because the religious-exemption rule did more than address the potential conflicts between the accommodation and RFRA that the agencies identified. JA43. That criticism simply ignores the agencies' full justification for the rule.

Broadly reevaluating their approach, the agencies reasonably concluded that offering an exemption and a choice whether to use the accommodation was a better policy than an accommodation alone, based on their consideration of multiple factors. Having made that determination, it was rational to extend the exemption to all companies using the accommodation, including those that did not have religious objections to the accommodation. JA418–19. While the agencies concluded RFRA required an exemption for entities with sincere religious objections to the accommodation, JA419, that conclusion about what RFRA requires was not the sole justification for the religious-exemption rule, but instead an additional, independent basis for the

exemption.  The agencies made clear they decided it was appropriate to adopt the exemption "even if RFRA does not compel" it.  JA418; JA521.

The district court failed to engage with the agencies' actual reasoning.  It instead substituted its own judgment about what it wished the agencies' goal had been—narrowly resolving RFRA violations remaining under the prior accommodation—and then faulted the agencies for doing more than necessary to address the district court's chosen goal.  JA37–40.  That was error.

Second, because the religious-exemption rule independently rested on policy grounds, it was unnecessary for the district court to consider the alternative, independent justification that the rule is authorized by RFRA (and, indeed, compelled as to at least some religious objectors).  In any event, the agencies reasonably concluded that RFRA requires an exemption for entities with sincere religious objections to the accommodation and authorizes such an exemption for entities with objections to the contraceptive-coverage mandate.

Third, the agencies explained that a publicly traded company with religious objections was "unlikely" but "possible," and explained that if such a company existed, RFRA supported granting it an exemption.

21

JA383–84. Without disputing either that such a company was possible or that RFRA supported an exemption if such a company existed, the district court erroneously said that deciding how an unlikely situation should be addressed was "logically inconsistent," such as believing "both 'x is true'" and "'x is not true.'" JA40.

Fourth, the agencies reasonably decided to rely on *ex post* enforcement as a means of ensuring that objecting entities had sincere religious objections, rather than individualized *ex ante* judicial determinations in RFRA lawsuits. JA432. The district court was wrong to fault the agencies for adopting a "categorical approach." JA42–43.

Fifth, the district court faulted purported inadequacies in the agencies' explanations for their change of position on three narrow issues. But the district court failed to engage with the adequate reasons the agencies gave for two of the issues, *infra* pp. 49–52, and, on the third, merely disagreed with the agencies' judgment, which had been thoroughly explained in the final rule, JA426–29.

Sixth, the district court said the agencies had not considered "an avenue for individuals to still get contraceptive coverage even if they

are a member of an exempt plan." JA55. But the agencies had considered this option and provided a reasoned explanation for not adopting it. JA419–20.

Seventh, the district court's ruling that "moral objections" are an impermissible consideration, JA49, blatantly flouts the Supreme Court's holding that, given the agencies' broad discretion, the agencies can lawfully exempt moral objectors. *Little Sisters*, 591 U.S. at 676.

Just as the Supreme Court rejected the district court's earlier reasons for holding the rules unlawful, this Court should reject its (purportedly) new reasons. The religious-exemption rule and moral-exemption rule are both reasonable and reasonably explained.

At minimum, universal vacatur was overbroad. A narrower remedy, tailored to these two State plaintiffs and any shortcomings in the rules, would provide plaintiffs complete relief.

## STANDARD OF REVIEW

This Court "review[s] the district court's summary judgment decision de novo, while applying the appropriate standard of review to the agency's decision. Under the APA, [this Court] review[s] agency actions to determine whether they were arbitrary, capricious, an abuse

23

of discretion, or otherwise not in accordance with law." *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (citations and quotation marks omitted).

"The scope of review under the 'arbitrary and capricious' standard is narrow," *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), and a plaintiff challenging agency rules faces a "high bar," *New Jersey Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 102 (3d Cir. 2014). Under this deferential standard, "a court is not to substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43, and "is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives," *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 292 (2016). "Rather, the court must uphold a rule if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (alteration adopted and quotation marks omitted). That requirement "is satisfied when the agency's explanation is clear enough that its path may reasonably be discerned." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quotation marks omitted).

24

## ARGUMENT

### I.   The Religious-Exemption Rule Is Reasonable And Reasonably Explained.

The religious-exemption rule was the product of reasoned decisionmaking.  The agencies provided thorough, rational explanations in both the interim final rule, JA507–50, and the final rule, JA410–64. The agencies explained why the exemptions are the "most appropriate administrative response" regardless of whether RFRA "compel[s]" them. JA418.  While this policy judgment was "independently sufficient," the agencies separately concluded "that an expanded exemption is required by RFRA for at least some objectors."  JA419.  Both conclusions were reasonable.

### A.   The Agencies Reasonably Adopted The Religious Exemption As The Better Policy, As Fully Explained In The Rulemaking.

**1.**   In the wake of the *Zubik* remand, the agencies had reached an impasse, determining that no compromise accommodation would satisfy both the federal government's and objecting entities' interests. The agencies "concluded it [was] appropriate to reexamine the exemption and accommodation scheme currently in place."  JA514. While putting an end to RFRA litigation was one goal of the

rulemaking, it was far from the only goal.  The agencies also reasonably decided to "reevaluate [their] exemptions and accommodations" more broadly in light of their current views on the "interests served by the existing Guidelines, regulations, and accommodation process," a recent Executive Order,[3] the agencies' broad discretion, the structure and intent of the ACA, and "the regulatory process and comments submitted in various requests for public comment."  JA508; *see, e.g.*, JA413; JA419.

This reevaluation culminated in a policy judgment that allowing objecting entities an exemption and a choice whether to use the accommodation was preferable to the accommodation being the only recourse for objecting entities.  JA508; JA521; JA522; JA418; JA419; JA420; JA426.  The agencies explained they would adopt the religious-exemption rule for these policy reasons "even if RFRA does not compel" broadening the exemption, JA418; *see* JA419 (explaining the policy rationale as "independent" of what RFRA requires).

When determining the scope of the religious exemption, the agencies addressed two different groups with religious objections.

---

[3] *Promoting Free Speech and Religious Liberty*, Exec. Order No. 13798, 82 Fed. Reg. 21,675 (May 9, 2017).

There was a broader group (recognized in *Hobby Lobby*) who objected to the contraceptive-coverage mandate, and a narrower subset (like the plaintiffs in *Zubik*) who also objected to the accommodation. Having concluded that the exemption was better policy regardless of what RFRA requires, the rational decision was to extend the exemption to the broader group—all parties that could use the accommodation—not just the narrower subset with RFRA objections to the accommodation.

2.    The agencies explained that their policy decision to provide a broader exemption in addition to an optional accommodation was justified by multiple factors. In the agencies' view, "a broader exemption is a more direct, effective means of satisfying all bona fide religious objectors," avoids the risk of new objections to the accommodation (and the attendant "consum[ption]" of "resources"), and was "more workable" than providing the accommodation as the sole option for companies with religious objections to the mandate. JA521; *see* JA419 (preferring "the more straightforward choice of an exemption").

The exemption would also "avoid inconsistency in respecting religious objections," JA416—a goal the agencies could not have

achieved by making the accommodation the sole option just for some employers (*i.e.*, for those who had no religious objection to it). In that regard, the agencies recognized that they could not require self-insured church plans to implement the accommodation because the agencies' authority to enforce self-insured plans' compliance arose from ERISA, from which church plans are exempt. JA516. This led to "significant incongruity in the requirement to provide contraceptive coverage among nonprofit organizations with religious objections to the coverage." JA516; *see also* JA421.

The agencies also noted that Congress had not mandated "that contraceptives be covered, much less that they be covered without religious exemptions," and had also decided not to apply the preventive-services mandate to grandfathered plans, further supporting a decision to provide an exemption. JA416. And Congress had also established a "background rule" in RFRA against substantially burdening sincere religious beliefs and had consistently provided "additional, specific exemptions for religious beliefs in statutes addressing federal requirements in the context of health care and specifically concerning issues such as … contraception." JA416. The agencies thus considered

it "appropriate, to the extent we impose a contraceptive coverage Mandate by the exercise of agency discretion," also to "include exemptions for the protection of religious beliefs in certain cases." JA416.

Moreover, the agencies explained why providing entities an exemption and a choice whether to use the accommodation was unlikely to have a significant effect. By retaining the accommodation as optional, employers who are satisfied with that option can continue to use it. *See* 45 C.F.R. § 147.131(c)–(d); JA443–45. "And unless an employer has a religious objection to the accommodation, it is unclear why an employer would give it up" because "[t]he accommodation does not impose any cost on an employer, and it provides an added benefit for the employer's work force." *Little Sisters*, 591 U.S. at 702–03 (Alito, J., concurring); *see Hobby Lobby*, 573 U.S. at 722 (explaining how offering fewer employee benefits places companies at "a competitive disadvantage in retaining and attracting skilled workers"). The agencies thus believed many entities previously using the accommodation would continue to do so. *See* JA450–51.

29

Weighing benefits of the "straightforward" and "direct" process adopted in the final rule—particularly more "workab[ility]," less litigation risk, and increased consistency—against the agencies' reasonable judgment of the likely limited effects, the agencies reasonably concluded that providing an exemption with the option whether to use the accommodation was better policy.

The agencies amply "articulated a satisfactory explanation for [their] action, including a rational connection between the facts found and the choice made," *Electric Power Supply Ass'n*, 577 U.S. at 292 (alterations adopted), and their "explanation is clear enough that [the agencies'] 'path may reasonably be discerned,'" *Encino Motorcars, LLC*, 579 U.S. at 221 (citation omitted).  The agencies also "display[ed] awareness that [they were] changing position," and explained their reasons for doing so.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  The agencies "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agenc[ies] *believ[e]* it to be better."  *Id.*

30

**3.**    Rather than taking issue with this reasoning, the district court substituted its own judgment about what it wished the agencies had set out to accomplish—redefining the goal narrowly as eliminating the RFRA violations caused by the accommodation—and then faulted the agencies for not tailoring their rule to the district court's preferred goal.  The "mismatch between the scope of the religious exemption and" the district court's narrow description of what "the agencies set out to address" does not suggest arbitrary reasoning, JA37 (quoting *Little Sisters*, 591 U.S. at 707 (Kagan, J., concurring in the judgment)), but merely shows that the district court ascribed the wrong goals to the agencies.

The district court's objection relies on the erroneous premise that RFRA violations alone—and not policy judgments—were the sole basis for the rule.  To support that necessary but mistaken conclusion, the district court cites—without further explanation, *see* JA37 (citing JA420–22)—to only a single subsection of the final rule, Section II.C.2, which explained the agencies' alternative, independent justification that the exemption "is required by RFRA for at least some objectors." JA419.  But the district court ignores that the immediately preceding

31

Section II.C.1 explained why the agencies were adopting the rule for policy reasons regardless of what RFRA required, *see* JA418–20; *supra* pp. 25–30, and the district court ignores the extensive discussion of how the agencies were broadly reevaluating and revisiting their approach.

To the extent the district court's opinion could be read to say the agencies lacked authority to do more than cure the remaining RFRA violations, that would have been patently erroneous. The Supreme Court already held in this case that the agencies had authority *under the ACA* for these exemptions regardless of whatever authority RFRA confers. *Little Sisters*, 591 U.S. at 675–83. Indeed, the Supreme Court's discussion of RFRA was limited to holding that it was "appropriate" for the agencies "to *consider* RFRA" and to "loo[k] to RFRA as a *guide*." *Id.* at 680, 683 (emphasis added). It would be a stunning development to now say that the agencies can consider and address *only* RFRA violations. In any event, RFRA independently authorized the exemption as a remedy for religious objections to the contraceptive-coverage mandate. RFRA does not prescribe the remedy for its violation, *see* 42 U.S.C. § 2000bb-1, and the agencies reasonably chose the expanded exemption as an appropriate remedy. As the

32

agencies explained, while "[t]he prior administration *chose*" to attempt to comply with RFRA "through the complex accommodation," RFRA did not "compel[] that novel choice or prohibit[] the current administration from employing the more straightforward choice of an exemption." JA419.  The agencies further observed that if they "had simply adopted an expanded exemption from the outset—as they did for churches—no one could reasonably have argued that doing so was improper because they should have invented the accommodation instead."  JA419.  The agencies have "discretion" to "craf[t] what they regar[d] as the best solution" to avoid any RFRA violation.  *Little Sisters*, 591 U.S. at 702 (Alito, J., concurring).  Here, the agencies reasonably concluded that extending the exemption to all entities with a religious objection to the contraceptive-coverage mandate was an appropriate exercise of that discretion.  *See id.* at 703 ("Nothing in RFRA requires that a violation be remedied by the narrowest permissible corrective.").

The reasoned decisionmaking standard is satisfied when agencies, as they did here, provide a "satisfactory explanation for [their] action, including a rational connection between the facts found and the choice made." *Electric Power Supply Ass'n*, 577 U.S. at 292 (citation omitted).

Having concluded an exemption with a choice whether to use the accommodation was better policy than the accommodation alone *independent of what RFRA required*, the agencies rationally extended the better policy to all entities who could have used the accommodation *even when that extended beyond what RFRA required.* Given the agencies' broader policy judgments, there was no mismatch between the agencies' reasoning and the final rule.

### B. While The Court Need Not Consider The Agencies' Alternative Explanation, RFRA Does Require A Broader Exemption In Some Cases.

**1.** The agencies also reasonably concluded that there was an additional, independent justification for the expanded exemption— namely, that it was compelled by RFRA, at least for entities with religious objections to the accommodation. JA419.

At the threshold, it is unnecessary for this Court to consider that alternative rationale. "[W]hen an agency relies on multiple grounds for its decision," alternate grounds are irrelevant "as long as" at least one ground "is valid and 'the agency would clearly have acted on that ground even if the other were unavailable.'" *Casino Airlines, Inc. v. National Transp. Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006)

34

(quoting *Mail Order Ass'n of Am. v. USPS*, 2 F.3d 408, 434 (D.C. Cir. 1993)); *see* 5 U.S.C. § 706 (courts reviewing agency action shall take "due account" of "the rule of prejudicial error"). In both the interim and final rules, the agencies made clear that they would adopt the rules for policy reasons wholly independent of whether the exemption was required under RFRA. *See, e.g.*, JA521 (exemptions "are the most appropriate administrative response" which the agencies adopted regardless of whether RFRA "compel[s]" them); *see* JA418 (similar). These policy conclusions were "independently sufficient" before considering the agencies' view that "an expanded exemption is required by RFRA for at least some objectors." JA419. Consistent with these explanations, the agencies repeatedly emphasized that the expanded exemption was being adopted for policy reasons. *E.g.*, JA418; JA419; JA426; JA508; JA521; JA522. The district court erred in suggesting that flaws in this alternative justification would warrant vacating the rule.

  **2.** In any event, the agencies are correct that RFRA requires an exemption for entities who sincerely believe "that complying with either

the Mandate *or the accommodation* was inconsistent with their religious observance or practice." JA420 (emphasis added).

Under RFRA, the federal government may not "substantially burden a person's exercise of religion" unless the government "demonstrates" such burden is "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b). Requiring a person either to pay a substantial fine or "engage in conduct that seriously violates their religious beliefs" substantially burdens their exercise of religion. *Hobby Lobby*, 573 U.S. at 720; *see Priests for Life v. U.S. Dep't of Health & Hum. Servs.*, 808 F.3d 1, 17 (D.C. Cir. 2015) (Kavanaugh, J., dissenting from denial of rehearing en banc) (collecting cases). The accommodation under the prior rules did not eliminate the substantial burden because many people sincerely believed the required conduct—such as providing the self-certification required by the accommodation—violated their religious beliefs.

Those objectors are "entitled to 'draw a line' regarding the conduct that [their] religion deems permissible, and once that line is drawn, 'it is not for a court to say that the line was unreasonable.'" *Sharpe Holdings v. HHS*, 801 F.3d 927, 939 (8th Cir. 2015) (quoting *Thomas v.*

36

*Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 715 (1981)) (alteration adopted).[4] "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others." *Thomas*, 450 U.S. at 714. Accordingly, a court "may not question the wisdom or reasonableness (as opposed to the sincerity) of plaintiffs' religious beliefs—including about complicity in wrongdoing." *Priests for Life*, 808 F.3d at 18 (Kavanaugh, J., dissenting from denial of rehearing en banc).

The Supreme Court reiterated this principle in *Hobby Lobby*, firmly dismissing the government's argument that "the connection between what the objecting parties must do ... and the end that they find to be morally wrong ... is simply too attenuated" on the grounds that it is a "question that the federal courts have no business addressing." 573 U.S. at 723–24; *see id.* at 725 ("it is not for us to say that their religious beliefs are mistaken or insubstantial").[5]

---

[4] The *Sharpe Holdings* decision was part of the circuit split prior to *Zubik* and was vacated when *Zubik* was decided. *HHS v. CNS Int'l Ministries*, 2016 WL 2842448, at *1 (U.S. May 16, 2016).

[5] Even if a court could second-guess the reasonableness of religious beliefs, "[t]he inescapable bottom line" here "is that the accommodation demanded that parties like the Little Sisters engage in conduct that was a necessary cause of the ultimate conduct to which they had strong religious objections." *Little Sisters*, 591 U.S. at 695

*Continued on next page.*

Because the accommodation still imposed a substantial burden on religious exercise, the agencies could demand compliance only if doing so were the least restrictive means of furthering a compelling governmental interest.  The rule explained why the agencies cannot make that showing.  JA420–22.  Therefore, RFRA required the agencies to provide an exemption to entities with a sincere religious objection to the accommodation.  *See Little Sisters*, 591 U.S. at 701–02 (Alito, J., concurring).[6]

The agencies' choice to adopt an exemption in addition to an optional accommodation is particularly reasonable given the protracted litigation over whether the accommodation violates RFRA.  *See* JA513; *cf. Ricci v. DeStefano*, 557 U.S. 557, 585 (2009) (holding that an

---

(Alito, J., concurring); *see Priests for Life*, 808 F.3d at 20 (Kavanaugh, J., dissenting from denial of rehearing en banc) ("After all, if the form were meaningless, why would the Government require it?").

[6] Indeed, the agencies "were required by RFRA to create the religious exemption (or something very close to it)."  *Little Sisters*, 591 U.S. at 688, 691–701 (Alito, J., concurring).  The exemption was required for entities who object to the accommodation, and even though the exemption was extended more broadly for policy reasons, there are reasons that the expanded exemption is unlikely to have much of a practical difference, *see supra* p. 29 (explaining why entities happy with the accommodation are unlikely to switch).

employer need only have a strong basis to believe than an employment practice violates Title VII's disparate-impact ban in order to take certain types of remedial action that would otherwise violate Title VII's disparate-treatment ban).  The agencies were reasonably responding to the considerable doubt about the sufficiency of the accommodation raised in both that litigation and the rulemaking process.  *Cf. Walz v. Tax Comm'n*, 397 U.S. 664, 669 (1970) (recognizing "room for play in the joints" when accommodating exercise of religion).

The district court disagreed.  Rather than allowing the agencies to reasonably incorporate litigation burdens, uncertainty, and risks into their decision, the district court concluded that any RFRA misinterpretation required vacating the rule.  JA48.  It further concluded that the exemption was not required by RFRA based on its erroneous conclusion that "binding Third Circuit precedent" holds that "the [a]ccommodation did not substantially burden religious exercise." JA44.  But neither decision the district court relied upon is binding precedent on this issue.

First, *Geneva College v. Secretary*, *HHS*, 778 F.3d 422 (3d Cir. 2015), was vacated by the Supreme Court, *Zubik*, 136 S. Ct. 1557, and

this Court has since recognized that "*Geneva* is no longer controlling," *Real Alternatives, Inc. v. Secretary, HHS*, 867 F.3d 338, 356 n.18 (3d Cir. 2017).

Second, *Real Alternatives* did not decide whether the accommodation process imposed a substantial burden *on employers*:  the question presented there was whether the contraceptive-coverage mandate imposed a substantial burden on *employees*, 867 F.3d at 343, and the panel held it did not for reasons that do not carry over to employers, *id.* at 362 (noting a "material difference between employers arranging or providing an insurance plan that includes contraception coverage … and [employees] becoming eligible to apply for reimbursement for a service of one's choosing").

Even if *Geneva* or *Real Alternatives* were precedential on this issue (they are not), they would be incorrectly decided for the reasons explained above.

Although any misinterpretation would have been irrelevant because the agencies adopted an expanded exemption regardless of that interpretation, the agencies' interpretation of RFRA was nonetheless correct.

40

### C.    The Exemption Reasonably Includes Public Companies With Sincere Religious Objections.

The rule's treatment of publicly traded companies is also reasonable.  While acknowledging it was "unlikely," the agencies concluded it was "possible that a publicly traded company might have religious objections to contraceptive coverage."  JA436–37.  Accordingly, the agencies considered how the regulation should apply to this unlikely event.  Based on the statutory text and consistent with the reasoning of *Hobby Lobby*, the agencies concluded that if such a company existed, RFRA supported making such companies eligible for the religious exemption.  JA436.

The district court did not fault either the factual conclusion that such companies might exist or the legal conclusion about how to interpret RFRA.  The factual conclusion is reasonable—*unlikely* does not mean *impossible*—and any error would be harmless as the regulation would have no effect.  The legal interpretation reasonably follows from *Hobby Lobby*.[7]  *See United States v. Safehouse*, 146 F.4th

---

[7] RFRA applies to any "person's" exercise of religion, 42 U.S.C. § 2000bb-1(a), and the Dictionary Act defines "person" to include "corporations," 1 U.S.C. § 1.  "[N]o known understanding of the term

*Continued on next page.*

315, 320 (3d Cir. 2025) (characterizing *Hobby Lobby* as "suggest[ing] that even 'large, publicly traded corporations' are RFRA persons").

The district court instead said it was error for the agencies to consider how a regulation would apply to an unlikely but possible event. The court described regulating an unlikely event as "talking out of both sides of [the agencies'] mouth" by advancing two views that are "conflicting positions regarding the same issue" and "logically inconsistent," such as believing "both 'x is true' … [and] 'x is not true.'" JA41–42. That reasoning is blatantly wrong. There is nothing "conflicting" or "inconsistent" about thinking an event is unlikely and still providing for how it should be treated, as agencies routinely do. *E.g.*, 44 Fed. Reg. 75,167, 75,169 (Dec. 19, 1979) (regulations providing "[e]mergency measures" in the "unlikely event" of a nuclear accident); *Hapner v. Tidwell*, 621 F.3d 1239, 1248 (9th Cir. 2010) (agency providing for the "unlikely event" a rare bird's nest is found). The agencies' provision for publicly traded companies with religious

---

'person' includes *some* but not all corporations." *Hobby Lobby*, 573 U.S. at 708; *see also* JA436–37; JA525.

objections to providing contraceptive coverage was neither arbitrary nor capricious.

### D.    The Process To Obtain An Exemption Is Reasonable.

The district court also concluded the rule is arbitrary because the "categorical approach" provides "no mechanism for evaluating the sincerity of the objector's religious beliefs, or whether complying with" the contraceptive-coverage mandate (or the accommodation) "substantially burdens the individual's religious exercise."  JA43.  This is erroneous.

1.    The district court's criticism is difficult to understand.  As the federal defendants explained below, Dkt. 343-1 at 16; the plaintiffs acknowledged below, Dkt. 345 at 6; and the agencies explained in their rule, JA432, "the [m]andate is enforceable through various mechanisms in the [Public Health Service] Act, the [Internal Revenue] Code, and ERISA," such that "[e]ntities that insincerely or otherwise improperly operate as if they are exempt would do so at the risk of enforcement under such mechanisms," JA432.  In particular, the mandate is backed by tax penalties, *see* 26 U.S.C. §§ 4980D, 4980H; ERISA enforcement actions, *see* 29 U.S.C. §§ 1132, 1185d; and other federal and state

enforcement authority, *see, e.g.*, 42 U.S.C. § 300gg-22.  The agencies reasonably elected to utilize after-the-fact enforcement to police insincere religious objections.

Allowing entities to obtain an exemption without filing a notice or self-certification broke no new ground, as the existing, narrower religious exemption also did not require notice or self-certification.  The agencies explained that they were "not aware of instances" under that exemption "where the lack of a self-certification" had "led to abuses or to an inability to engage in enforcement."  JA432.  Furthermore, the agencies noted that group health plans are required to provide a comprehensive summary of benefits covered by the plan and disclose any reductions in covered services or benefits, so beneficiaries in plans will know whether an exemption has been claimed and could raise appropriate challenges to such claims.  JA432.  The agencies thus provided a reasoned explanation for their decision, and nothing more was required.

**2.**    The district court's objection that this enforcement mechanism was not tailored to the narrow goal the district court misattributed to the rule (resolving RFRA violations) falls flat for the

reasons its other mismatch objections fail: the agencies' goals were not so narrow. *See supra* pp. 25–34.

But even if the agencies had been focused solely on avoiding RFRA violations, the agencies could have reasonably adopted a different approach to policing the boundary than RFRA lawsuits. The Supreme Court in *Little Sisters* upheld the religious exemption as a permissible exercise of the agencies' "virtually unbridled discretion" *under the ACA*. 591 U.S. at 675–83. The question, therefore, is not—as the district court seemed to erroneously frame it—whether the rule recreates the ex ante process of RFRA lawsuits to evaluate objectors' sincerity before providing an exemption. Under the deferential arbitrary-and-capricious standard of APA review, the only question is whether the agencies, in exercising their considerable discretion under the ACA, reasonably decided to rely on ex post enforcement. They did.

### E. The Agencies Reasonably Explained Their Changes of Position.

The district court further held that the agencies "failed to provide a satisfactory explanation for their change in course." JA51. But the agencies' voluminous explanation for their changed position easily satisfies the reasoned-decisionmaking standard.

1.    "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC*, 579 U.S. at 221.  Although the agency ordinarily must "display awareness that it *is* changing position," it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Fox Television*, 556 U.S. at 515.

The agencies' lengthy discussion of their change of position in both the interim and final rules easily satisfies that standard.  "Although" the agencies "previously took the position that the application of the Mandate to certain objecting employers was necessary to serve a compelling governmental interest," the interim final rule adopted the opposite position, giving seven reasons "no one of which [was] dispositive."  JA515–21.  The lengthy explanation for this overall change in position was adequate—and the district court did not say otherwise.

The district court focused solely on the *seventh* reason the agencies gave for changing their position about whether a compelling

46

interest was served:  that the "administrative record on which the
Mandate rests is insufficient to meet the high threshold to establish a
compelling governmental interest in ensuring that women covered by
plans of objecting organizations receive cost-free contraceptive coverage
through those plans."  JA518.  But the agencies explained at length the
basis for this reassessment.

In the interim final rule, the agencies explained that the "rates
of—and reasons for—unintended pregnancy are notoriously difficult to
measure."  JA518.  Illustrating why the mandate may have a limited
impact on unintended pregnancy, one study had been unable to
conclude that the contraceptive-coverage mandate caused an increase in
contraceptive use.  JA519.  The agencies also raised concerns that
"[c]ontraception's associations with positive health effects might also be
partially offset by an association with negative health effects."  JA519;
*see* JA519–21.  The agencies concluded they "need not take a position on
these empirical questions" and that their "review [was] sufficient to lead
[them] to conclude that significantly more uncertainty and ambiguity
exists in the record than [they] previously acknowledged."  JA520.

In the final rule, the agencies extensively addressed comments about their changes in position and again explained their many independent reasons for concluding the mandate did not serve a compelling interest. JA420–22. Specifically addressing whether the contraceptive-coverage mandate was effective at reducing pregnancies, the agencies explained that they had less confidence in the mandate's effects because employees of objecting organizations may be less likely to want contraceptives and "the availability of contraceptive coverage from other possible sources" limits the mandate's effect on contraception use. JA422; *see* JA424 ("[A]t least one study … concluded the Mandate has caused no clear increase in contraceptive use; one explanation proposed by the authors of the study is that women eligible for family planning from safety net programs were already receiving free or subsidized contraceptive access through them…").

The agencies also discussed at length "[w]hether and to what extent it is certain that an interest in health is advanced" by the mandate. JA422; *see* JA426–29. The agencies addressed conflicting comments suggesting more or less certainty about the health benefits of the mandate, JA426–27; responded to specific commenters who claimed

that agencies "made incorrect statements concerning scientific studies," JA427–28; and addressed comments about the certainty (or lack thereof) of the effects of broader exemptions on "teen sexual activity" and "unintended pregnancy," JA428–29. The agencies concluded that "reexamination of the record and review of the public comments has reinforced [their] conclusion that significantly more uncertainty and ambiguity exists on" the health benefits of the mandate. JA429.

These explanations readily satisfy the reasoned-decisionmaking standard.

**2.** The district court agreed that the agencies acknowledged they were changing positions and that the agencies explained their reasons for doing so but nonetheless found fault with three narrow parts of the agencies' reasoning. JA51–53.

First, the district court faulted the agencies for changing their position on "contraception's effectiveness" and failing to cite any studies "supporting the conclusion that contraception is ineffective in reducing [teen and unwanted] pregnancies." JA53–54. But in the portion of the final rule the district court quotes, the agencies were not doubting how effective *contraception* is at preventing pregnancy, but how effective the

49

*contraceptive-coverage mandate* is at doing so.[8]  JA428–29 ("it is difficult to establish causation between granting religious exemptions to the contraceptive Mandate and either an increase in teen pregnancies in particular, or unintended pregnancies in general").  As the agencies explained, many factors such as access to other sources of contraception, characteristics of employees working at entities seeking exemptions, and reduced sexual activity may all result in the *contraceptive-coverage mandate* (or exemptions from the mandate) having a limited effect on unintended pregnancies.  JA428–29; *see* JA522 ("[C]ontraceptives are readily accessible and, for many low income persons, are available at reduced cost or for free through various governmental programs, and contraceptive coverage may be available through State sources or family plans obtained through non-objecting employers…").  Moreover,

---

[8] After receiving comments similarly mischaracterizing the agencies' doubts, the agencies clarified that commenters had "misunderstood": the agencies had not been "tak[ing] a position on the empirical question of whether contraception has caused certain reductions in teen pregnancy" but had instead "note[d] that studies suggesting various causes of teen pregnancy and unintended pregnancy in general support the Departments' conclusion that it is difficult to establish causation between granting religious exemptions to the contraceptive Mandate and either an increase in teen pregnancies in particular, or unintended pregnancies in general."  JA428.

the agencies did not conclude that the mandate was "ineffective"; they merely had less certainty about its effectiveness. The agencies provided ample explanation for that modest reduction in certainty.

Second, the district court's criticism of the agencies' decision to not take a position on whether certain contraceptives are "abortifacients," JA54, fails to engage with the agencies' *legal* reasons for not doing so. The interim final rule had observed that many people believe certain contraceptives are abortifacients and thus have sincere religious objections to providing coverage for them, but the interim final rule expressed no view on whether these contraceptives are, in fact, abortifacients. *See, e.g.*, JA554; JA556–57; JA565. In the final rule, the agencies acknowledged comments claiming that those people were wrong to believe those contraceptives are abortifacients, summarized the various arguments on both sides, and then gave a compelling legal reason why it was not deciding that issue: under RFRA, the agencies explained, what matters is that some people have sincere religious objections because *those people* believe these contraceptives are abortifacients, and RFRA protects their exercise of religion *regardless of whether that is correct*. JA427–28. That correctly states longstanding

51

Supreme Court precedent. *See, e.g.*, *Thomas*, 450 U.S. at 714; *supra* pp. 36–37. Having explained why the dispute is not legally relevant, the agencies had no duty to provide "factual evidence," JA54, to justify why they were not taking a position.[9]

Finally, the district court also said the agencies failed to adequately explain their adoption of uncertainty about the health effects of contraceptives. JA51–52. The agencies devoted an entire subsection of the final rule, however, to a lengthy explanation of the change in position on the health effects of contraceptives. JA426–29. The district court merely disagreed with the agencies' technical judgments and conclusions, substituting its judgment for that of the agencies. The court, for example, disagreed with the agencies' technical judgment about how broadly to interpret one study's findings. *Compare* JA53, *with* JA426–27. But "[w]hen reviewing scientific and technical

---

[9] Other federal law restricts the government from mandating objecting parties take certain actions related to abortion. In a prior rulemaking, the agencies had taken a position on this factual dispute to explain how mandating the use of the accommodation was compliant with these other laws. JA659. Given the expanded exemption, that was no longer necessary.

data we defer to the findings and expertise of the" agencies. *Kleissler v. U.S. Forest Serv.*, 183 F.3d 196, 198 (3d Cir. 1999).

The district court also seemingly applied a 'new evidence' rule, objecting that "most of the studies the Agencies cited to in justifying their change in position were published either before or during the years that the Agencies concluded that contraception was safe." JA53. But agencies can reasonably revisit a previous decision—even on the exact same record—and reach a different conclusion. *National Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012) (holding that, even without "new facts," "a reevaluation of which policy would be better in light of the [same] facts" is permissible). And even on its own terms, this criticism fails. The studies were identified in comments after the 2017 interim final rules were issued, *see* JA426–27, and there is no indication the agencies considered them in prior rulemaking. Several were published mere weeks before the agencies' prior final rule, including a study by the Agency for Healthcare Research and Quality that the agencies discussed extensively. JA519 & n.40; JA426–27 & nn. 28, 34. Multiple other cited studies were published after the prior rule. *See* JA426–27 & nn. 28, 29, 34.

**3.**    If these explanations were inadequate (they are not), any shortcomings were harmless.  The agencies gave "multiple reasons" for their broader change in position about whether the mandate served a compelling interest.  JA515.  The district court's concerns focused entirely on the agencies' "seventh" reason, JA518–21, which the rules made clear was not "dispositive."  JA515; *see* JA420.  Any inadequacy in explaining such a minor point in the agencies' reasoning would not be a reason to vacate the rules.  *See Li Hua Yuan v. Attorney Gen. of U.S.*, 642 F.3d 420, 427 (3d Cir. 2011) (explaining that an error is harmless when it is "highly probable that the error did not affect the outcome").

### F.    The Agencies Considered Reasonable Alternatives.

The agencies considered a variety of reasonable alternatives.  The district court erred in holding otherwise, focusing on a purported failure to consider "the option of providing an avenue for individuals to still get contraceptive coverage even if they are a member of an exempt plan." JA55.  But the agencies *did* consider alternative ways "to deliver contraceptive coverage" to individuals if their employer obtains an exemption.  JA419.  The agencies explained that if the alternative "still delivers contraceptive coverage through use of the objecting employer's

54

plan, issuer, or third party administrator," then "it does not address the religious objections." JA419. So, the agencies focused on ways to "deliver contraceptive coverage independent and separate from the objecting employer's plan, issuer, and third party administrator," JA419, and gave two reasons they decided not to modify the rule.

First, the district court's proposal would not be an *alternative* to the religious exemption at all; instead, it would involve creating a *new* government program *in addition to* the exemption. Because the exemption would still be needed, this idea "would not be a reason not to offer the expanded exemptions." JA419.

Second, while the religious-exemption rule exercised the agencies' "authority to provide exemptions to the Mandate," the agencies in 2018 were "not aware of the authority, or of a practical mechanism, for using section 2713(a)(4)[10] to require contraceptive coverage be provided specifically to persons covered by an objecting employer, other than by using the employer's plan, issuer, or third party administrator." JA419–20. These two concerns adequately explained why the agencies

---

[10] Section 2713(a)(4) of the Public Health Services Act is codified at 42 U.S.C. § 300gg-13(a)(4).

did not alter the religious-exemption rule after considering this potential addition to the rule.

Years later, in 2023, the agencies proposed a new program through which employees of an objecting entity might still obtain cost-free contraceptive coverage. *See* 88 Fed. Reg. 7,236 (Feb. 2, 2023). Notably, the proposed rule would still "maintain the November 2018 final rules' religious exemption," *id.* at 7,243, confirming that the additional program would not be a reason to refrain from adopting the expanded religious exemption. Further, the agencies later withdrew this proposed rule, 89 Fed. Reg. 106,393 (Dec. 30, 2024), providing circumstantial support for their earlier conclusion that such an approach presents legal and practical challenges.

Even had the district court been correct that the agencies had not considered this alternative, that still would not warrant vacating the rule for two reasons. First, agencies are not required to consider every conceivable alternative and neither the plaintiffs nor district court have identified any comment raising the option the district court focused on, which alone is a sufficient reason to reject plaintiffs' challenge. *See, e.g.*, *Ron Peterson Firearms, LLC v. Jones*, 760 F.3d 1147, 1163 (10th

Cir. 2014). At bottom, the district court's implicit premise appears to be that the agencies needed to searchingly consider the narrowest way to accommodate religious objection, but such a rule finds no basis in the arbitrary-and-capricious standard, the ACA, or RFRA. Second, the appropriate remedy would have merely been remand without vacatur to consider supplementing the exemption with an additional program.

## II.    The Moral-Exemption Rule Is Reasonable And Reasonably Explained.

The moral-exemption rule is the product of reasoned decisionmaking. The agencies "concluded that it is appropriate to provide moral exemptions and access to the accommodation." JA476; *see also* JA477–78. "[I]f Congress had expressly mandated contraceptive coverage in the ACA," the agencies doubted whether "it would have done so without providing for similar exemptions"; accordingly, the moral exemption adopted by the agencies was "generally consistent" in scope with other moral exemptions Congress has provided, JA476. The agencies further explained that the moral exemption advanced the agencies' preference to "avoid the stark disparity that may result from respecting religious objections … but not respecting parallel objections for moral convictions." JA476. The

57

agencies also considered the legal challenges to the contraceptive-coverage mandate based on "non-religious moral convictions." JA475. The agencies balanced, among other things, "the governmental interest in requiring contraceptive coverage" against "the interest in protecting moral convictions" and concluded "that affording the exemptions to protect moral convictions is a more appropriate administrative response than continuing to refuse to extend the exemptions and accommodations." JA478. They further concluded that "merely" extending "accommodation[s] … would not adequately address … moral objections," expressly equating this policy reason for providing the moral exemption with the reasoning of its religious exemption. JA477.

The district court identified three reasons the moral-exemption rule was arbitrary and capricious, but none withstands scrutiny.

### A.   Moral Objections Are A Permissible Consideration.

Despite the Supreme Court holding *in this case* that it was lawful to "create … exemptions" for "moral" objectors, 591 U.S. at 677, the district court said it was unlawful to consider "moral objections," JA51. That erroneous conclusion blatantly flouts the Supreme Court's decision and reasoning.

The Supreme Court held "that the ACA gives HRSA broad discretion … to create the religious and moral exemptions." 591 U.S. at 677. The Court explained that the statute "grants sweeping authority to HRSA," including "virtually unbridled discretion to decide what counts as preventive care and screenings." *Id.* at 676. And that "same capacious grant of authority" also "leaves [HRSA's] discretion equally unchecked in other areas, including the ability to identify and create exemptions from its own Guidelines." *Id.* "[T]he statute is completely silent as to *what*" the guidelines "must contain or how HRSA must go about creating them." *Id.* "Congress could have limited HRSA's discretion in any number of ways, but it chose not to do so." *Id.* at 677. The ACA does not limit the "criteria or standards" that are used to develop exemptions, *id.* at 676, and "courts" cannot "impos[e] limits on agency's discretion that are not supported by the text," *id.* at 677.

But that is exactly what the district court did on remand. Dismissing *Little Sisters* as "tangential" to the issue before it, JA49, the district court ignored the Supreme Court's command to ask what positive law limits the consideration of moral objections and instead concluded that the absence of a provision stating "the Agencies may

consider moral objections" was fatal.[11]  JA48.  That is fundamentally

irreconcilable with the Supreme Court's explanation of the expansive

discretion the ACA confers on the agencies.  For one, the Supreme

Court could not have been clearer that the agencies have the statutory

authority to create a moral exemption.  That necessarily means that the

agencies can at least *consider* moral objections on their way to

promulgating an exemption.  For another, the district court's invocation

of the ACA's silence as reason to forbid consideration of moral objections

has the law entirely backwards.  As *Little Sisters* made clear, the ACA's

silence is reason to accord the agencies "virtually unbridled discretion,"

591 U.S. at 676, not a reason to shackle them.  If the district court were

correct that the agencies could consider only the factors affirmatively

listed in the ACA, it would mean the agencies could consider nothing at

---

[11] The district court's further reliance on Congress's failure to enact a 2012 amendment to the Women's Health Amendment to include a moral exemption, JA48–49, is irrelevant given the agencies' virtually unbridled discretion under the statutory grant of authority to the agencies.  In any event, "[a]ll we can know for certain is that speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt."  *Bostock v. Clayton County*, 590 U.S. 644, 670 (2020) (citation omitted); *see also Hobby Lobby*, 573 U.S. at 719 n.30 (dismissing this failed amendment as "meager legislative history").

all because the ACA does not "set forth any criteria or standards" to guide the creation of exemptions.  *Id.*

"Lower court judges may sometimes disagree with [the Supreme Court's] decisions, but they are never free to defy them."  *NIH v. APHA*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring in part).  Five years ago, the Supreme Court considered the moral exemption and determined that the agencies had the authority to create it.  That the district court envisions a world where agencies are forbidden from *considering* an action they are authorized to take is a bare attempt to circumvent *Little Sisters*.  This Court should not countenance that misguided course.

### B. The Moral-Exemption Rule Is Reasonably Explained.

 The district court raised two criticisms of the moral-exemption rule that were also levied against the religious-exemption rule.  For the reasons already discussed, neither criticism is warranted.

The agencies thoroughly explained their modest shift in views.  *Supra* pp. 45–54.  The moral-exemption rule's explanation for the change in relevant views substantially overlaps with the religious-exemption rule and is found at JA482–86.

61

The agencies also adequately considered regulatory alternatives. *Supra* pp. 54–57.  The moral-exemption rule "incorporate[s] … by reference" the religious-exemption rule's explanation of changes to the accommodation, which included the discussion of the alternative of providing coverage outside of an objecting entities' plan.  JA496.

The moral-exemption rule was reasonable and reasonably explained.

## III.  In Any Event, Universal Vacatur Was Improper.

Because the rules were reasonable and reasonably explained, the Court should reverse and need not reach the proper scope of the remedy.  But were the Court to reach it, the district court's vacatur of the final rules was overbroad.  The APA does not authorize vacatur or a departure from traditional principles of equity, which limit courts to party-specific relief tailored to the legal violation.

1.     The APA does not authorize vacatur.  In APA challenges, as in any other case involving non-monetary relief, federal courts are authorized to award traditional party-centered remedies such as declaratory judgments and, where necessary, appropriately tailored injunctions.  But the APA does not authorize courts to radically depart

from those traditional remedies, let alone to do so by default through remedies such as vacatur.  *See United States v. Texas*, 599 U.S. 670, 693–703 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment).  *But cf. Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826–43 (2024) (Kavanaugh, J., concurring) (expressing a contrary view).  Under Section 702 of the APA, judicial review is available only to "person[s]" who have "suffer[ed] legal wrong because of agency action, or [been] adversely affected or aggrieved by agency action."  5 U.S.C. § 702.  Aggrieved persons may seek remedies as set forth in the succeeding section, 5 U.S.C. § 703.  Section 703 specifies that where, as here, there is no "special statutory review proceeding" applicable to the matter, the plaintiff may bring "any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus."  *Id.*  "Conspicuously missing from [this list of remedies] is vacatur."  *Texas*, 599 U.S. at 698 (Gorsuch, J., concurring).  And in the absence of a special review statute, the ordinary method of review before the APA was a suit in equity against a federal official, typically

seeking a prohibitory injunction. *See, e.g.*, *American Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902).

In granting vacatur, the district court invoked § 706(2) of the APA. JA56–58. Many other courts, particularly the D.C. Circuit, have long done the same. *See Texas*, 599 U.S. at 701 (Gorsuch, J., concurring). Those precedents are not probative of § 706(2)'s meaning since venue rules may give the D.C. Circuit's administrative-law precedents nationwide effect in many contexts. Regardless, they do not meaningfully grapple with § 706(2)'s text, which states that, in certain circumstances, a reviewing court "shall … hold unlawful and set aside agency action." 5 U.S.C. § 706. As discussed, remedies under the APA are governed by Section 703. Section 706, by contrast, is "titled 'Scope of review'" and addresses "the court's decisional process leading up to [its] judgment," not "the remedies the court may authorize after reaching its judgment on the merits." *Texas*, 599 U.S. at 696 (Gorsuch, J., concurring). *But see Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 191 (3d Cir. 2014) (relying on § 706 to vacate rules without discussing § 703).

**2.**     Even if vacatur were a permissible remedy under the APA, it is an equitable remedy subject to ordinary equitable principles. Nothing about the term "set aside" suggests that Congress intended to "overthrow the 'bedrock practice of case-by-case judgments with respect to the parties in each case'" and authorize sweeping relief as a matter of course.  *See Texas*, 599 U.S. at 695, 702 (2023) (Gorsuch, J., concurring) (citation omitted).  To the contrary, the APA expressly states that "[n]othing" in the statute "affects … the power or duty of the court to … deny relief on any … equitable ground."  5 U.S.C. § 702(1).  Courts should accordingly consider whether declaratory or injunctive relief in lieu of vacatur is appropriate and, if not, whether any vacatur remedy should be tailored rather than universal.

Courts "do not lightly assume that Congress has intended to depart from established principles" of equity, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), and ordinarily courts expect that Congress will make "an unequivocal statement of its purpose" if it intends to make "a drastic departure from the traditions of equity practice," *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944); *accord Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024).  Nothing in the

APA authorizes courts to depart from traditional equitable principles and grant universal relief as a matter of course.

Three ordinary equitable principles are particularly relevant in considering the appropriate relief here.

*First*, remedies "ordinarily operate with respect to specific parties," rather than "on legal rules in the abstract," *California v. Texas*, 593 U.S. 659, 672 (2021) (quotation marks omitted).  Equitable relief should "be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*."  *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025) (quoting parenthetically *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  Narrower party-specific relief (such as geographic relief) would fully remedy the States' injuries.

*Second*, under "well-established principles of equity," a party seeking an injunction must affirmatively "demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved" by the relief requested.  *eBay Inc. v.*

66

*MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Like injunctive relief, vacatur should be treated as an extraordinary remedy that should not be granted unless the party seeking it has carried the burden of persuasion on all four requirements—which the States have not done.

*Third*, equitable remedies are tailored to the legal violation the court finds.  *See Gill v. Whitford*, 585 U.S. 48, 66 (2018) ("a plaintiff's remedy must be 'limited to the inadequacy that produced his injury'" (alteration omitted)).  If the Court identifies a narrow flaw in the rules—for example, plaintiffs' argument that public companies should not have been included—the remedy should redress that shortcoming, not vacate the rules in their entirety.  This principle is reinforced here by the rules' inclusion of a severability clause.  JA201; JA253.

For these reasons, even if the district court can issue an order styled as a "vacatur," that order should conform with traditional equitable principles and be sufficiently narrowed to achieve a party-specific injunction tailored to address any specific flaws in the rules.

# CONCLUSION

For the foregoing reasons, the judgment vacating the final rules should be reversed or, at a minimum, narrowed.[12]

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney*
    *General*

SHARON SWINGLE

*s/ Derek Weiss*
 
DEREK WEISS

JACOB CHRISTENSEN

   *Attorneys, Appellate Staff*
   *Civil Division, Room 7230*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 616-5365*
   *derek.l.weiss@usdoj.gov*

December 2025

---

[12] No party challenges the portions of the order granting partial summary judgment to the government and dismissing several claims. Those aspects of the order should be affirmed.

## COMBINED CERTIFICATIONS

1.    Government counsel are not required to be members of the bar of this Court.

2.    This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,502 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

3.    On December 12, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

4.    The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

5.    This document was scanned for viruses using Crowdstrike Falcon Sensor, and no virus was detected.


*s/ Derek Weiss*
Derek Weiss