# In the United States Court of Appeals for the Third Circuit

COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY,

*Plaintiffs-Appellees,*

v.

PRESIDENT UNITED STATES OF AMERICA; SECRETARY UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SECRETARY UNITED STATES DEPARTMENT OF TREASURY; UNITED STATES DEPARTMENT OF TREASURY; SECRETARY UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES OF AMERICA,

*Defendants-Appellants,*

and

LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOUSE,

*Intervenor-Defendant-Appellant.*

On Appeal from the United States District Court for the Eastern District of Pennsylvania

**BRIEF OF *AMICI CURIAE* AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS AND 10 MEDICAL ORGANIZATIONS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Francisco Negrón, Jr.
AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS
409 12th Street, SW
Washington, D.C. 20024

Kaitlyn Golden
Carrie Y. Flaxman
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Amici Curiae*

# CERTIFICATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Third Circuit Rule 26.1.1, each of *amici curiae* American College of Obstetricians and Gynecologists, American Academy of Family Physicians, American College of Medical Genetics and Genomics, American College of Nurse-Midwives, American College of Physicians, American Gynecological & Obstetrical Society, American Society for Reproductive Medicine, American Medical Women's Association, North American Society for Pediatric and Adolescent Gynecology, Society of General Internal Medicine, and Society of Gynecologic Oncology state that they have no parent corporations and that no publicly held corporation owns more than ten percent of its stock.

/s/ *Kaitlyn Golden*
Kaitlyn Golden
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... iii

INTEREST OF AMICI CURIAE ................................................................. 1

INTRODUCTION .......................................................................................... 5

ARGUMENT .................................................................................................. 7

I. CONTRACEPTION IS SAFE, EFFECTIVE AND AN ESSENTIAL COMPONENT OF PREVENTATIVE HEALTH CARE. ................................ 7

    A. Contraception is Safe and Effective ......................................... 9

    B. Unintended Pregnancy and Short Interpregnancy Intervals Pose Health Risks to Women and Children. ..................................... 12

    C. Contraception is Beneficial for Women with Certain Health Conditions or Risks. .................................................................. 14

II. THE FINAL RULES UNDERMINE SEAMLESS ACCESS TO CONTRACEPTION, ALONG WITH THE PATIENT-CLINICIAN RELATIONSHIP AND CONTINUITY OF CARE. ................................... 16

    A. The Final Rules Undermine Seamless Access to Care for Many Women. ...................................................................................... 16

    B. The Final Rules Also Undermine the Patient-Clinician Relationship. ............................................................................... 21

CONCLUSION ............................................................................................. 23

# TABLE OF AUTHORITIES

**Federal Regulations**

Religious Exemptions and Accommodations for Coverage of Certain
Preventative Services Under the Affordable Care Act,
83 Fed. Reg. 57536 (Nov. 15, 2018)..................................................16, 17, 21

**Other Authorities**

Adam Sonfield et al., *Moving Forward: Family Planning in the Era of
Health Reform*, Guttmacher Inst. (2014) .................................................11, 14

Agustin Conde-Agudelo & Jose M. Belizan, *Maternal Morbidity and
Mortality Associated with Interpregnancy Interval: Cross Sectional
Study*, 321 British Med. J. 1255 (2000) ........................................................14

Am. Acad. of Pediatrics, *Policy Statement: Breastfeeding and the Use of
Human Milk*, 150(1) Pediatrics 1 (2022) .....................................................13

Am. Coll. of Obstetricians & Gynecologists, Comm. Op. No. 385, *The
Limits of Conscientious Refusal in Reproductive Medicine*, 110(5)
Obstetrics & Gynecology 1203 (Nov. 2007, *aff'd* 2019)............................20

Am. Coll. of Obstetricians & Gynecologists, Comm. Op. No. 654,
*Reproductive Life Planning to Reduce Unintended Pregnancy*, 127
Obstetrics & Gynecology e66 (Feb. 2016) ...................................................22

Am. Coll. of Obstetricians & Gynecologists, Comm. Op. No. 672, *Clinical
Challenges of Long-Acting Reversible Contraceptive Methods*,
128(3) Obstetrics & Gynecology e69 (Sept. 2016, *aff'd* 2024)..............10, 11

Am. Coll. of Obstetricians & Gynecologists, Comm. Op. No. 788, *Over-
the-Counter Access to Hormonal Contraception*, 134(4) Obstetrics &
Gynecology e96 (Oct. 2019, *aff'd* 2025) ...................................................10

Am. Coll. Of Obstetricians & Gynecologists, Comm. Statement No. 21,
*Access to Contraception*, 146(5) Obstetrics & Gynecology e88 (Nov.
2025) ..........................................................................................................4, 22

Am. Coll. of Obstetricians & Gynecologists, *Guidelines For Women's Health Care* (4th ed. 2014) ............................................................... 12

Am. Coll. of Obstetricians & Gynecologists, Practice Bulletin No. 186, *Long-Acting Reversible Contraception: Implants and Intrauterine Devices*, 130(5) Obstetrics & Gynecology e251 (2017) ........................... 9, 10

Am. Med. Ass'n, *AMA Code of Medical Ethics Op. 1.1.3*, Patient Rights ............. 21

Anna Glasier et al., *A review of the effectiveness of a progrestogen-only pill containing norgestrel 75 ug/day*, 105 Contraception 1 (2022) ............... 11, 12

Cass R. Sunstein, *Nudges.gov: Behavioral Economics and Regulation* (Feb. 2013) ..................................................................................... 18

Ctrs. for Disease Control & Prevention, *Achievements in Public Health, 1900-1999: Family Planning,* (Dec. 3, 1999) ........................................ 14, 15

Ctrs. for Disease Control & Prevention*, U.S. Medical Eligibility Criteria for Contraceptive Use, 2024*, 73(4) Morbidity and Mortality Wkly. Rep. 1 (Aug. 8, 2024) ....................................................................... 9

Dahlia K. Remler & Sherry A. Glied, *What Other Programs Can Teach Us: Increasing Participation in Health Insurance Programs*, 93 American J. Pub. Health 67 (2003) ...................................................... 18, 19

Debbie Postlethwaite et al., *A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change*, 76 Contraception 360 (2007) ...................... 18

Diana Greene Foster et al., *Number of Oral Contraceptive Pill Packages Dispensed and Subsequent Unintended Pregnancies*, 117 Obstetrics & Gynecology 566 (2011) ............................................................. 19

F. Gary Cunningham et al., *Williams Obstetrics* 926-1264 (24th ed. 2014) ............ 15

FDA, *Birth Control* (May 10, 2024) ........................................................... 9

Frederic Blavin et al., *Using Behavioral Economics to Inform the Integration of Human Services and Health Programs under the Affordable Care Act*, Urban Inst. (July 12, 2014) ................................... 18, 19

Gary Claxton et al., *Employer-Sponsored Health Insurance 101*,
KFF (Oct. 8, 2025)............................................................16

Gladys Martinez et al., *Use of Family Planning and Related Medical
Services Among Women Aged 15-44 in the United States: National
Survey of Family Growth, 2006-2010,* Nat'l Health Stat. Rep. 68
(Sept. 5, 2013)................................................................7

Guttmacher Inst., *Sharing Responsibility: Women, Society and Abortion
Worldwide* (1999) ..........................................................8

Guttmacher Inst., *Testimony of Guttmacher Institute Submitted to the
Committee on Preventive Services for Women Institute of Medicine*
(Jan. 12, 2011)..............................................................17

Heidi D. Nelson et al., *Associations of Unintended Pregnancy With
Maternal and Infant Health Outcomes: A Systematic Review and
Meta-analysis*, 328(17) JAMA 1714 (2022) .............................13

Inst. of Med*., Clinical Preventive Services for Women: Closing the Gaps*
(2011) ....................................................................8, 15

Jennifer J. Frost & Jacqueline E. Darroch, *Factors Associated with
Contraceptive Choice and Inconsistent Method Use, United States,
2004*, 40(2) Persps. on Sexual & Reprod. Health 94 (2008) ...........22, 23

Jennifer M. Gierisch et al., *Oral Contraceptive Use and Risk of Breast,
Cervical, Colorectal, and Endometrial Cancers: A Systematic
Review*, 22 Cancer Epidemiology, Biomarkers & Prevention 1931
(2013) .....................................................................11

Jessica D. Gipson et al., *The Effects of Unintended Pregnancy on Infant
Child, and Parental Health: A Review of the Literature*,
39 Stud. in Fam. Planning 18 (2008) ...............................12, 13

Kelly R. Culwell & Joe Feinglass, *The association of health insurance with
use of prescription contraceptives*, 39(4) Persps. on Sexual &
Reprod. Health 226, 230 (2007) ......................................18

Lawrence B. Finer & Mia R. Zolna, *Unintended Pregnancy in the United States: Incidence and Disparities, 2006*, 84(5) Contraception 478 (2011) ................................................................................................12

Lina S. Mørch et al., *Contemporary Hormonal Contraception and the Risk of Breast Cancer*, 377 New England J. Med. 2228 (2017).....................10, 11

Liza Fuentes et al., *Primary and reproductive healthcare access and use among reproductive aged women and female family planning patients in 3 states*, 18 PLOS ONE 5 (2023) ................................................17

Lori M. Gawron et al., *Multi-morbidity and Highly Effective Contraception in Reproductive-Age Women in the US Intermountain West: a Retrospective Cohort Study*, 35 J. Gen. Internal Med. 637 (2020)...12, 13, 15

Rachel Benson Gold et al., *The Implications of Defining When a Worman is Pregnant*, 8:2 Guttmacher Pol'y Rev. 7 (2005) ......................................9

Rachel Benson Gold et al., *Next Steps for America's Family Planning Program: Leveraging the Potential of Medicaid and Title X in an Evolving Health Care System*, Guttmacher Inst. (2009) ............................................7

Ronald Burkman et al., *Safety Concerns and Health Benefits Associated With Oral Contraception,* 190 Am. J. of Obstet. & Gynecol. S5 (2004) ........................................................................................15

U.S. Dep't of Health & Human Services, *Family Planning*, Healthy People 2030 ...............................................................................12, 14

*Amici* are leading health organizations that share the common goal of improving health outcomes by ensuring that all patients have access to high quality, comprehensive, and evidence-based medical care. Well-established, evidence-based standards of care recommend that women and adolescents of childbearing age have access to contraception and related counseling as essential components of effective health care. *Amici* submit this brief to highlight the importance of contraception to women's preventive health care and the grave harms to women's health and public health generally presented by the Final Rules.

*Amici* are:

**American College of Obstetricians and Gynecologists (ACOG)** is a non-profit educational and professional organization. With more than 62,000 members, ACOG is the leading professional association of physicians who specialize in the health care of women. ACOG's members represent more than 90% of all board-certified obstetricians and gynecologists practicing in the United States. As the leading professional association for physicians who specialize in the health care of women, ACOG supports access to comprehensive contraceptive care and contraceptive methods as an integral component of women's health care and is committed to

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund this brief, and no person other than *amici curiae*, their members, and their counsel contributed money to fund this brief. All parties have consented to the filing of this brief.

encouraging and upholding policies and actions that ensure the availability of affordable and accessible contraceptive care and contraceptive methods.

Founded in 1947, the **American Academy of Family Physicians ("AAFP")** is one of the largest national medical organizations, representing 129,300 family physicians and medical students nationwide. AAFP seeks to improve the health of patients, families, and communities by advocating for the health of the public and by supporting its members in providing continuous comprehensive health care to all.

The **American College of Medical Genetics and Genomics (ACMG)** is the only nationally recognized medical professional organization solely dedicated to improving health through the practice of medical genetics and genomics, and the only medical specialty society in the U.S. that represents the full spectrum of medical genetics disciplines in a single organization. The ACMG is dedicated to improving health through the clinical and laboratory practice of medical genetics and to guiding the safe and effective integration of genetics and genomics into all of medicine and healthcare, resulting in improved personal and public health.

The **American College of Nurse-Midwives (ACNM)** is the professional association that represents Certified Nurse-Midwives (CNMs) and Certified Midwives (CMs) in the United States. ACNM's members are primary health care clinicians who provide evidence-based midwifery care for women throughout the lifespan. Midwifery as practiced by CNMs and CMs, encompasses a full range of primary health care services for women from adolescence beyond menopause.

**American College of Physicians** is the largest medical specialty organization and the second largest physician membership society in the United States. ACP members include 163,000 internal medicine physicians, related subspecialists, and medical students. Internal medicine physicians are specialists who apply scientific knowledge, clinical expertise, and compassion to the preventive, diagnostic, and therapeutic care of adults across the spectrum from health to complex illness.

**American Gynecological & Obstetrical Society (AGOS)** is a non-profit educational and professional organization of more than 500 physicians who are academic thought leaders within Obstetrics and Gynecology. AGOS promotes excellence in women's health care through education, research, innovation and advocacy. AGOS supports women's health care research funding, training and competency of the Ob/Gyn work force and policies that protect reproductive health care through all stages of life.

**American Society for Reproductive Medicine (ASRM)** is dedicated to the advancement of the science and practice of reproductive medicine. Its members include approximately 8,000 professionals.

**The American Medical Women's Association (AMWA)** is the oldest multi-specialty organization dedicated to advancing women in medicine and improving women's health. Our membership is comprised of physicians, residents, medical students, pre-medical students, health care professionals, and supporters. AMWA's mission is advancing women physicians and improving the health of women with a

vision of a thriving healthy, equitable world. American Medical Women's Association co-founded the Reproductive Health Coalition, a wide-range of health professional associations and allied organizations who advocate with a unified voice to protect access to reproductive care. Through the coalition, AMWA advocates for full, comprehensive reproductive health care access, including the right to contraception.

**North American Society for Pediatric and Adolescent Gynecology (NASPAG)** is a voluntary, non-profit organization devoted to conducting, encouraging, and supporting programs of medical education and professional training in the field of pediatric and adolescent gynecology (PAG). NASPAG members reside in all 50 states and in countries abroad. Its focus is to serve and be recognized as the lead provider in PAG education, research, and clinical care; conduct and encourage multidisciplinary and inter-professional programs of medical education and research in the field of PAG; and advocate for the reproductive well-being of children and adolescents and the provision of unrestricted, unbiased, and evidence-based practice of PAG.

The **Society of General Internal Medicine (SGIM)** is a member-based association of over 3,300 of the world's leading general internal medicine physicians, who are dedicated to the mission of cultivating innovative educators, researchers, and clinicians in general internal medicine, leading the way to better health for everyone. SGIM members advance the practice of medicine through their commitment to

providing comprehensive, coordinated, and cost-effective care to adults; educating the next generation of outstanding physicians; and conducting cutting-edge research to improve quality of care and clinical outcomes of all patients.

The **Society of Gynecologic Oncology ("SGO")** is the premier medical specialty society for healthcare professionals trained in the comprehensive management of gynecologic cancers, representing more than 3,000 members, including physicians, advanced practice providers, nurses, and patient advocates. SGO and its members work to increase awareness of gynecologic cancers and to improve care for individuals diagnosed with these diseases. Its mission includes supporting research, disseminating knowledge, and raising standards of practice in the prevention and treatment of gynecologic malignancies. The Society's expertise in gynecologic cancer encompasses matters affecting cancer risk and prevention, including access to a full spectrum of contraceptive options and their potential impact on gynecologic cancer risk reduction.

### INTRODUCTION

Our nation continues to experience a health care crisis: quality, affordable contraception remains out of reach far too many Americans. The Patient Protection and Affordable Care Act (ACA) provides a critical tool to fighting back. The ACA requires private health insurance plans to cover essential preventive care services at no additional cost to the patient, including FDA-approved contraceptives prescribed by a health care provider. The ACA requirement that health plans cover contraception

recognizes that women of childbearing age have unique health needs and that contraceptive counseling and services are essential components of women's routine preventive health care.

This requirement makes good sense. The safety and efficacy of contraception are beyond dispute, and the benefits of contraception, which are widely recognized, include improved health and well-being for women and their families, reduced maternal mortality, and engagement in the work force and economic self-sufficiency.

The Religious Rule and Moral Rule (collectively, the Final Rules) undermine access to contraception promised by the ACA by allowing virtually any employer or health insurance issuer to exclude contraception from insurance coverage by invoking religious or moral objections. The district court correctly concluded that the Final Rules are arbitrary and capricious. In doing so, the court properly recognized that Defendant Agencies failed to offer a detailed justification required for the changes, including for their suggestion that the safety and efficacy of contraceptives are in question. JA51-53. They could not offer that justification even if they had tried: contraceptives have long been shown to be safe and effective at preventing unintended pregnancy.

The Final Rules deprive countless women nationwide of the seamless, no-cost contraceptive coverage required by the ACA. Without insurance coverage of contraception generally or of their chosen method, women will either be forced into a two-tiered system to access contraceptive care, forced to pay out of pocket, or

prevented from accessing care all together. The Final Rules threaten the health of women and families throughout the United States, undermining Congress's very objective in making comprehensive preventive women's healthcare widely accessible, and disrupting the seamless provision of healthcare within the existing patient-provider relationship.

*Amici* submit this brief to highlight for the Court the importance of contraception to women's preventive health care and the grave harms to women's health and public health generally presented by the Final Rules now at issue. *Amici* urge this Court to uphold the district court's decision.

**ARGUMENT**

**I.     CONTRACEPTION IS SAFE, EFFECTIVE AND AN ESSENTIAL COMPONENT OF PREVENTATIVE HEALTH CARE.**

Access to contraception is a medical necessity for women during approximately thirty years of their lives— from adolescence to menopause. *See* Rachel Benson Gold et al., *Next Steps for America's Family Planning Program: Leveraging the Potential of Medicaid and Title X in an Evolving Health Care System*, Guttmacher Inst. (2009), https://perma.cc/TAN6-QH3X; *see also* Gladys Martinez et al., *Use of Family Planning and Related Medical Services Among Women Aged 15-44 in the United States: National Survey of Family Growth, 2006-2010*, Nat'l Health Stat. Rep. 68 (Sept. 5, 2013), https://perma.cc/5XK4-A63R. Virtually all American women, irrespective of their religious affiliation, who have had heterosexual sex have used

contraception at some point during their lifetimes.  Am. Coll. Of Obstetricians *&* Gynecologists, Comm. Statement No. 21, *Access to Contraception*, 146(5) Obstetrics & Gynecology e88, e89 (Nov. 2025) ("ACOG Comm. Statement").

Contraceptives have long been shown to be safe and effective at preventing unintended pregnancy, providing substantial health benefits.  Unintended pregnancy and pregnancies close in time present significant risks to pregnant people and their children.  Indeed, in recommending that contraceptive methods and counseling be included within the preventive services required by the ACA, the Institute of Medicine ("IOM") recognized that the risk of unintended pregnancy affects a broad population and poses a significant impact on health.  Inst. of Med*., Clinical Preventive Services for Women: Closing the Gaps* 8, 10 (2011) ("IOM Report").

With women potentially capable of experiencing approximately twelve pregnancies during their lifetime without the ability to control their fertility, Guttmacher Inst., *Sharing Responsibility: Women, Society and Abortion Worldwide*, 18 (1999), https://perma.cc/YLC6-J2G6, contraceptives allow women to plan the timing and spacing of their pregnancies.  Contraceptives likewise provide substantial health benefits by allowing women with medical conditions that would make pregnancy dangerous or with other health conditions to prevent unplanned pregnancy. Given women's unique reproductive health needs, it is critical to ensure, for as many women as possible, seamless access to the effective contraception that is medically appropriate for them.

**A.** **Contraception is Safe and Effective.**

Contraception has long been found safe and effective. The district court rightfully rejected Defendants' argument that there is "ambiguity" about the safety and effectiveness of contraception, JA52-53, because it is contrary to abundant scientific literature.

When used properly, FDA-approved contraceptives are safe for the vast majority of patients. While no medication is entirely without contraindications or risks, the FDA approves medications—including contraceptives—after a stringent safety review and only "when they are shown to be both safe and effective." FDA, *Birth Control* (May 10, 2024), https://perma.cc/Y9SB-WWGL; *see also* Ctrs. for Disease Control & Prevention, *U.S. Medical Eligibility Criteria for Contraceptive Use, 2024*, 73(4) Morbidity and Mortality Wkly. Rep. 1, 1 (Aug. 8, 2024), https://perma.cc/QWL3-99EZ (providing "recommendations for health care providers for safe use of contraceptive methods for persons who have certain characteristics or medical conditions within the framework of removing unnecessary medical barriers to accessing and using contraception.").[2]

---

[2] The district court also rightly noted that the Agencies improperly introduced ambiguity by suggesting some methods of FDA-approved contraceptives are "abortifacients." JA54. None of the FDA-approved contraceptive drugs or devices causes abortion; rather, they prevent pregnancy. Medically speaking, pregnancy begins only upon implantation of a fertilized egg in the uterine lining. *See, e.g.,* Rachel Benson Gold, *The Implications of Defining When a Woman is Pregnant*, 8:2 Guttmacher Pol'y Rev. 7, 7 (2005); Am. Coll. of Obstetricians & Gynecologists,

While each method of contraception may have some contraindications, all have met the FDA's stringent safety criteria. Long-acting reversible contraceptives, such as an intrauterine devices (IUD) or implants, have an "excellent safety record." Am. Coll. of Obstetricians & Gynecologists, Comm. Op. No. 672, *Clinical Challenges of Long-Acting Reversible Contraceptive Methods*, 128(3) Obstetrics & Gynecology e69, e74 (Sept. 2016, *aff'd* 2024). IUD complications occur in less than 1 percent of women regardless of age or IUD type. *Id.* at e69. Oral contraceptives likewise are safe for the vast majority of women. The risk of cardiovascular events, such as stroke and acute myocardial infarction, is low in healthy, reproductive-aged women. Am. Coll. of Obstetricians & Gynecologists, Comm. Op. No. 788, *Over-the-Counter Access to Hormonal Contraception*, 134(4) Obstetrics & Gynecology e96, e99 (Oct. 2019, *aff'd* 2025). The risk of more serious complications, such as venous thromboembolism (VTE) is small compared with the increased risk of VTE during pregnancy and the postpartum period. *Id.* While research suggests some increased risk of breast cancer following use of oral contraceptives, the overall increases in risk are small and falls after discontinuation of use. Lina S. Mørch et al., *Contemporary Hormonal*

---

Practice Bulletin No. 186, *Long-Acting Reversible Contraception: Implants and Intrauterine Devices*, 130(5) Obstetrics & Gynecology e251, e252-253 (2017) (available evidence supports that mechanism of action for intrauterine devices is preventing fertilization and not disrupting pregnancy). Regardless of one's personal or religious beliefs, the medical terms "abortion" and "abortifacient" refer to – and should only be used in connection with – the termination of a pregnancy, not the prevention of it.

*Contraception and the Risk of Breast Cancer*, 377 New England J. Med. 2228, 2233 (2017). And use of oral contraceptives is associated with significant reductions in colorectal, endometrial, and ovarian cancers. Jennifer M. Gierisch et al., *Oral Contraceptive Use and Risk of Breast, Cervical, Colorectal, and Endometrial Cancers: A Systematic Review*, 22 Cancer Epidemiology, Biomarkers & Prevention 1931, 1931 (2013).

Contraception is also undeniably effective at reducing unintended pregnancy. Of the women at risk for an unplanned pregnancy, the women who use contraceptives correctly throughout the year – approximately 68 percent of women in the U.S. – account for only 5 percent of all unintended pregnancies. By contrast, the 18 percent of women who use contraceptives inconsistently or incorrectly account for 41 percent of all unintended pregnancies. The remaining 14 percent of women at risk who do not use contraception at all, or who have gaps in usage of a month or more during each year, account for 54 percent of all unintended pregnancies. Adam Sonfield et al., *Moving Forward: Family Planning in the Era of Health Reform*, Guttmacher Inst. 8-9 (2014), https://perma.cc/UPY7-VTRZ ("Moving Forward"). The pregnancy risk in women who use IUDs is just 2 percent over 10 years, and less than 1 percent for implant users. Am. Coll. of Obstetricians & Gynecologists, Comm. Op. No. 672, *Clinical Challenges of Long-Acting Reversible Contraceptive Methods*, 128(3) Obstetrics & Gynecology e69, e73, e74 (Sept. 2016, *aff'd* 2024). With perfect use of oral contraceptives, only 0.3 percent of women will have an unplanned pregnancy.

Anna Glasier et al., *A review of the effectiveness of a progestogen-only pill containing norgestrel 75 µg/day*, 105 Contraception 1, 1 (2022).

**B.** **Unintended Pregnancy and Short Interpregnancy Intervals Pose Health Risks to Women and Children.**

Unintended pregnancy remains a significant public health concern in the United States; the unintended pregnancy rate in the United States is substantially higher than that in other highly industrialized regions of the world. Lawrence B. Finer & Mia R. Zolna, *Unintended Pregnancy in the United States: Incidence and Disparities, 2006*, 84(5) Contraception 478, 478, 482 (2011); Am. Coll. of Obstetricians & Gynecologists, *Guidelines For Women's Health Care* 343 (4th ed. 2014) ("ACOG Guidelines"). Nearly half of the pregnancies in the United States are unintended. *See* U.S. Dep't of Health & Human Services, *Family Planning*, Healthy People 2030, https://perma.cc/JH9P-N6KP ("Healthy People"); *see also* ACOG Guidelines at 343.

Studies have linked unintended childbearing with a number of adverse prenatal and perinatal outcomes. Women with unintended pregnancies are more likely to receive delayed prenatal care and to be anxious or depressed during pregnancy. Jessica D. Gipson et al., *The Effects of Unintended Pregnancy on Infant, Child, and Parental Health: A Review of the Literature,* 39 Stud. in Fam. Planning 18, 22, 28–29 (2008). A woman's unintended pregnancy may also have lasting effects on her child's health; low birth weight and preterm birth, which have long term sequelae, are associated with unintended pregnancies. Lori M. Gawron et al., *Multi-morbidity and Highly Effective*

*Contraception in Reproductive-Age Women in the US Intermountain West: a Retrospective Cohort Study*, 35 J. Gen. Internal Med. 637, 637 (2020); Heidi D. Nelson et al., *Associations of Unintended Pregnancy With Maternal and Infant Health Outcomes: A Systematic Review and Meta-analysis*, 328(17) JAMA 1714, 1716 (2022). Other studies find that children born as a result of unintended pregnancies have poorer physical and mental health and impaired mother-child relationships as compared with children from intended pregnancies. Gipson, *supra,* at 26-27; Nelson, *supra*, 1725-26. Women with unintended pregnancies are less likely to breastfeed, which has demonstrated health benefits for the mother and her child. Gipson, *supra*, at 24; Am. Acad. of Pediatrics, *Policy Statement: Breastfeeding and the Use of Human Milk*, 150(1) Pediatrics 1, 4 (2022) (noting benefits of breastfeeding to both mother and child).

Contraception not only helps to avoid unintended pregnancies, but it also helps women plan their pregnancies and determine the optimal timing and spacing of them, which improves their own health and the well-being of their children. Pregnancies that are too frequent and too closely spaced, which are more likely when contraception is difficult to obtain, put women at significantly greater risk of permanent physical health damage. Such damage can include uterine prolapse (downward displacement of the uterus), rectocele (hernial protrusion of the rectum into the vagina), cystocele (hernial protrusion of the urinary bladder through the vaginal wall), rectus muscle diastasis (separation of the abdominal wall), and pelvic floor disorders. Additionally,

women with short interpregnancy intervals are at greater risk of pregnancy complications, including third trimester bleeding, premature rupture of membranes, puerperal endometritis, anemia, and maternal death. Agustin Conde-Agudelo & Jose M. Belizan, *Maternal Morbidity and Mortality Associated with Interpregnancy Interval: Cross Sectional Study*, 321 British Med. J. 1255, 1257 (2000). Pregnancies that occur within 18 months of a previous birth are also linked to poor birth outcomes, including premature birth and low birth weight. Moving Forward, *supra*, at 6.

Accordingly, the CDC has found that smaller families and longer birth intervals contribute to the better health of infants, children, and women, and improve the social and economic status of women. Ctrs. for Disease Control & Prevention, *Achievements in Public Health, 1900-1999: Family Planning*, (Dec. 3, 1999), https://perma.cc/25W6-GCQX. Similarly, the U.S. Department of Health and Human Services has identified reducing unintended pregnancies, and increasing the "proportion of women who get needed publicly funded birth control services and support" as critical public health goals. *See* Healthy People, *supra*.

**C. Contraception is Beneficial for Women with Certain Health Conditions or Risks.**

Contraception also protects the health of those women for whom pregnancy can be hazardous, or even life-threatening. Women with certain chronic conditions such as heart disease, diabetes, hypertension, and renal disease are at increased risk for complications during pregnancy. Other chronic conditions complicated by pregnancy

include sickle-cell disease, epilepsy, cancer, lupus, rheumatoid arthritis, asthma, and HIV. *See generally*, F. Gary Cunningham et al., *Williams Obstetrics* 926-1264 (24th ed. 2014); s*ee also* Gawron, *supra*, at 639.

In addition to preventing pregnancy, contraception has other scientifically recognized uses and health benefits. Hormonal birth control helps address several menstrual disorders, helps prevent menstrual migraines, treats pelvic pain from endometriosis, and treats bleeding from uterine fibroids. Ronald Burkman et al., *Safety Concerns and Health Benefits Associated With Oral Contraception,* 190 Am. J. of Obstet. & Gynecol. S5, S12 (2004). Oral contraceptives have been shown to have long-term benefits in reducing a woman's risk of developing endometrial and ovarian cancer, protecting against pelvic inflammatory disease and certain benign breast disease, and short-term benefits in protecting against colorectal cancer. *Id.; see also* IOM Report, *supra*, at 107.

\* \* \* \*

The recognized benefits of contraceptives have led the CDC to identify family planning as one of the greatest public health achievements of the twentieth century. Ctrs. for Disease Control & Prevention, *Achievements in Public Health, 1900-1999: Family Planning*, (Dec. 3, 1999)*,* https://perma.cc/25W6-GCQX. For all of these reasons, accessible, affordable birth control is essential to women's health.

## II. THE FINAL RULES UNDERMINE SEAMLESS ACCESS TO CONTRACEPTION, ALONG WITH THE PATIENT-CLINICIAN RELATIONSHIP AND CONTINUITY OF CARE.

By permitting individual employers to opt out of contraceptive coverage, including on the basis of moral convictions not based in any particular religious belief, the Final Rules will undeniably reduce the availability of contraceptive coverage for women who want it. Roughly 60 percent of people under 65 access health insurance through an employer, Gary Claxton et al., *Employer-Sponsored Health Insurance 101*, KFF (Oct. 8, 2025), https://perma.cc/2G46-UPRD, leaving a significant swath of the population at risk of losing coverage under the Final Rules. The Final Rules provide no solution for women who seek access to contraception, but whose employers claim a religious or moral objection, aside from suggesting that they might avail themselves of other governmental programs or obtain contraceptive coverage elsewhere. *See, e.g.*, Religious Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act, 83 Fed. Reg. 57536, 57548 (Nov. 15, 2018) (asserting the availability of contraceptive coverage from other sources, including governmental programs for low-income women). The Final Rules, thus, threaten access to seamless care for countless women, resulting in grave harm to the public health.

### A. The Final Rules Undermine Seamless Access to Care for Many Women.

If upheld, the Final Rules permit employers to remove contraceptive coverage

under the health plan that covers a woman's other routine health services, or to remove coverage for the form of contraception that is most appropriate for her. Upon self-exemption by her employer, a woman is pushed into a two-tiered system of care—as she is forced to try to find another source of coverage for contraceptive care (if such option is even available)—or be forced to pay out of pocket for these services. *See* 83 Fed. Reg. at 57549 (acknowledging that some women may not receive contraceptive coverage, but contending that "Congress did not create a right to receive contraceptive coverage" in the ACA). If access to appropriate contraception is removed from women's routine health care services or is made more difficult, or costly, to obtain, the likely result is that many women will simply not use contraception, will use an imperfect form of contraception, or will use contraception inconsistently or improperly. Any of these scenarios portend an increase in unintended pregnancies with all their consequences.

Numerous studies confirm that cost is a significant consideration for many women in their choice of contraception, as well as its proper and consistent use. *See* Liza Fuentes et al., *Primary and reproductive healthcare access and use among reproductive aged women and female family planning patients in 3 states*, 18(5) PLOS One 1, 14 (2023); Guttmacher Inst., *Testimony of Guttmacher Institute Submitted to the Committee on Preventive Services for Women Institute of Medicine* 8 (Jan. 12, 2011), https://perma.cc/PXQ4-BKAT. Relatedly, insurance coverage has been shown to be a "major factor" for a woman when choosing a contraceptive method and

17

determines whether she will continue using it. Kelly R. Culwell & Joe Feinglass, *The association of health insurance with use of prescription contraceptives*, 39(4) Persps. on Sexual & Reprod. Health 226, 230 (2007); *see also* Debbie Postlethwaite et al., *A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change*, 76 Contraception 360, 360 (2007) (elimination of cost-sharing for contraceptives at Kaiser Permanente Northern California resulted in significant increases in the use of the most effective forms of contraceptives). By providing access to contraceptives with no out of pocket cost, the ACA reduces a substantial barrier—cost—to accessing safe and effective medical care.

Just as direct cost barriers deter women from using appropriate contraception, or from using appropriate contraception consistently, administrative or logistical barriers are also likely to result in lower or less consistent utilization rates. "Considerable research shows that modest procedural requirements—completing a simple form or even checking a box—can greatly lower participation levels in public and private benefit programs." Frederic Blavin et al., *Using Behavioral Economics to Inform the Integration of Human Services and Health Programs under the Affordable Care Act*, Urban Inst., ii (July 12, 2014), https://perma.cc/GWM3-DNXC; *see also* Dahlia K. Remler & Sherry A. Glied, *What Other Programs Can Teach Us: Increasing Participation in Health Insurance Programs*, 93 American J. Pub. Health 67, 67 (2003) (recognizing impact of nonfinancial features, such as administrative complexity, on enrollment); Cass R. Sunstein, *Nudges.gov: Behavioral Economics*

*and Regulation* 3 (Feb. 2013), https://perma.cc/228V-5ZHP (reducing paperwork burdens results in greater participation in public programs).

The most effective means of ensuring high utilization rates for benefits is when they are provided automatically. Remler & Glied, *supra*, at 73 (observing, as a "striking pattern," that programs where "no 'extra action' is required" have the highest "take up" or participation rates). For example, in Louisiana, when a child's enrollment in Medicaid was de-linked from the Supplemental Nutrition Assistance Program (SNAP) in 2011, thus requiring parents to check a box on the SNAP application form, enrollment in Medicaid through SNAP dropped off by an average of 62% per month. Blavin, *supra,* at 8 (noting that de-linking programs caused decline notwithstanding that "the check-box was highlighted, bolded, prominently placed" and written in clear language). And even the seemingly minor burden of having to renew or refill prescriptions more frequently results in reduced consistency in use of birth control and an increased risk of pregnancy. *See* Diana Greene Foster et al., *Number of Oral Contraceptive Pill Packages Dispensed and Subsequent Unintended Pregnancies*, 117 Obstetrics & Gynecology 566, 570-71 (2011).

Alternative arrangements to the birth control benefit will require a woman to take additional steps for contraceptive coverage beyond what is required for other covered services—for example, by trying to enroll in a separate plan on an exchange, making a separate visit to a different provider for contraceptive services, and/or paying out of pocket for covered services and seeking a reimbursement. Patients may

also be forced to choose a less desirable—or less medically appropriate—form of contraceptives. None of these proposed alternatives provide seamless no-cost coverage and therefore all would compromise the ACA's objective of facilitating access to contraception for all women who want it.

Additionally, when women face informational gaps on obtaining coverage for contraceptives outside of their employer-provided plan, this further exacerbates any administrative barriers discussed above. Any failure to adequately inform women how no-cost contraceptive coverage can be obtained (or even that it is available at all) necessarily impedes the ACA's objective of promoting contraceptive coverage and deprives women of the benefits promised by the ACA coverage requirement.

That access to care should not be undermined by conscience refusals that are not accompanied by patient protections. Conscience refusals—like those included in the Final Rules—undermine and impact the availability of reproductive health care. While conscience refusals should be accommodated where appropriate, that must be done in a way that does not violate a patient's rights, undercut a provider's ethical obligations, or undermine the provision of medical care. *See* Am. Coll. of Obstetricians & Gynecologists, Comm. Op. No. 385, *The Limits of Conscientious Refusal in Reproductive Medicine*, 110(5) Obstetrics & Gynecology 1203, 1205-06 (Nov. 2007, *aff'd* 2019). Conscience refusals for contraceptives undermine women's capacity to decide for themselves whether and under what circumstances to become pregnant and how to protect their health. *Id.* at 1205. By allowing virtually all

employers to opt out of providing contraceptive coverage without ensuring an alternative path to seamless access to birth control without copay to patients, the Final Rules will undoubtably undermine access to care that is critical preventive care for women. *See, e.g.*, 83 Fed. Reg. at 57548.

Accordingly, the district court properly recognized that Defendants had failed to consider "glaringly obvious alternatives," JA54-55, to the blanket opt-outs permitted by the Final Rules to ensure patients would be able to more seamlessly access contraceptives. That includes broadening the exemption to include just employers who notified the government of a sincere objection, Appellees' Br. 84, carving out a narrower moral exemption, *id.* at 86, or using a process that would make contraceptive coverage available to women covered by exempt organizations without any action on behalf of the objecting entity, *id.* at 87; *see also* JA55.

## B. The Final Rules Also Undermine the Patient-Clinician Relationship.

The patient-clinician relationship is essential to ensuring the delivery of high-quality health care. The health care professional and the patient share responsibility for the patient's health, and the well-being of the patient depends upon their collaborative efforts. Am. Med. Ass'n, *AMA Code of Medical Ethics Op. 1.1.3*, Patient Rights, https://perma.cc/MM4C-C2ZK.

The Final Rules undermine those patient-clinician relationships: if access to contraceptives and counseling are not covered by their insurance, patients may have

21

to seek clinicians outside their normal medical network to access affordable medical care. Pushing patients to seek care outside their established clinician-patient relationships undermines access to care. This is particularly true given the highly personal nature of the reproductive health and family planning services that are at issue here. Based on an evidence-based report issued by the CDC, ACOG stresses the importance of "effective and efficient patient-practitioner communication about reproductive life planning . . . .". Am. Coll. of Obstetricians & Gynecologists, Comm. Op. No. 654, *Reproductive Life Planning to Reduce Unintended Pregnancy*, 127 Obstetrics & Gynecology e66, e67 (Feb. 2016); *see also* ACOG Comm. Statement, *supra*, at e93. Women should be able to make these personal decisions— decisions that often require sharing intimate details of their sexual history and goals for family planning—with the health care professionals they have sought out and trust.

Even if a woman is able to obtain affordable contraceptive coverage outside of her regular health insurance, she may not be able to choose her health care professional, or see the same practitioner for follow-up visits. Continuity of care has been shown to affect continuity and consistency of contraceptive use, and women who are not satisfied with their health care professional, who do not see the same professional at visits, or who feel they cannot call their health care provider between visits are more likely to use contraception inconsistently. *See* Jennifer J. Frost & Jacqueline E. Darroch, *Factors Associated with Contraceptive Choice and*

*Inconsistent Method Use, United States, 2004*, 40(2) Persps. on Sexual & Reprod. Health 94, 100 (2008).

The contraceptive coverage requirement ensures seamless, no-cost coverage and continuity of care within the existing patient-clinician relationships. Women should be able to make personal decisions regarding their reproductive health—decisions that often require sharing intimate details of their sexual history and private family planning—in collaboration with their trusted health care providers. The patient's employer should not be part of that decision-making process, no matter their particular beliefs.

## CONCLUSION

For the foregoing reasons, this Court should affirm the decision below.

Respectfully submitted,

*/s/ Kaitlyn Golden*
Kaitlyn Golden
Carrie Y. Flaxman
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kgolden@democracyforward.org

Francisco Negrón, Jr.
AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS
409 12th Street, SW
Washington, D.C. 20024

*Counsel for* Amici Curiae

# CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 5190 words.

This filing also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Under Third Circuit Rule 31.1(c), I further certify that the text of the electronic brief is identical to the text in the paper copies, that a virus check was performed on this brief, and that it is free from viruses.  The check was performed using Malwarebytes 5.20 for Mac.

Under Third Circuit Rule 46.1, I further certify that Kaitlyn Golden, Carrie Flaxman, and Francisco Negron are all are members of the bar of this Court.

*/s/ Kaitlyn Golden*

Date: March 4, 2026

# CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2026, a true and accurate copy of the foregoing proposed brief was electronically filed with the Court using the CM/ECF system. Service on counsel for all parties will be accomplished through the Court's electronic filing system.

*/s/ Kaitlyn Golden*

Date: March 4, 2026