**No. 25-2662**

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY,

Plaintiffs-Appellees,

v.

PRESIDENT UNITED STATES OF AMERICA; SECRETARY UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SECRETARY UNITED STATES DEPARTMENT OF TREASURY; UNITED STATES DEPARTMENT OF TREASURY; SECRETARY UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES OF AMERICA,

Defendants-Appellants,

and

LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,

Intervenor-Defendant-Appellant.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

### REPLY BRIEF FOR THE FEDERAL APPELLANTS

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

SHARON SWINGLE
DEREK WEISS
JACOB CHRISTENSEN
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7320*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 616-5365*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES......................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT...........................1

ARGUMENT ..........................................................................................2

I.    The Religious Exemption Rule Is Reasonable And
      Reasonably Explained. ...................................................................2

      A.    The Rule Addresses Religious Objections To The
            Underlying Mandate. ............................................................2

            1.    Section II.C.1 Explained An "Independently
                  Sufficient" Policy Rationale. ...........................................4

            2.    The States' Counterarguments Lack Merit. ..................7

      B.    While The Court Need Not Decide The Issue, RFRA
            Does Require Exemptions In Some Cases. ...........................14

      C.    The Agencies Reasonably Included Public Companies. .......17

      D.    *Ex Post* Enforcement Mechanisms Are Reasonable. ............20

      E.    The Agencies Reasonably Explained Their Changes of
            Position. ...............................................................................21

      F.    The Agencies Considered Every Issue The States
            Allege They Failed To Consider. ..........................................28

            1.    The Agencies Considered Reasonable
                  Alternatives.................................................................28

            2.    The Agencies Considered Relevant Issues. .................29

II.   The Moral Exemption Rule Is Reasonable And Reasonably
      Explained. ....................................................................................31

A.    Moral Objections Are A Permissible Factor. ........................ 31

B.    The Rule Is Reasonably Explained. ..................................... 31

III.    In Any Event, Universal Vacatur Was Improper. .......................... 35

CONCLUSION ................................................................................... 36

COMBINED CERTIFICATIONS

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*American Iron & Steel Inst. v. EPA,*
  568 F.2d 284 (3d Cir. 1977) ....................................................................35

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014) ..................................................... 4, 5, 9, 18, 19, 21

*Casino Airlines, Inc. v. NTSB,*
  439 F.3d 715 (D.C. Cir. 2006) ......................................................... 14

*Coinbase, Inc. v. SEC,*
  126 F.4th 175 (3d Cir. 2025) ........................................................... 10

*Council Tree Commc'ns, Inc. v. FCC,*
  619 F.3d 235 (3d Cir. 2010) ............................................................ 35

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ........................................................................ 6

*FDA v. Wages & White Lion Invs., L.L.C.,*
  604 U.S. 542 (2025)....................................................................14-15

*Geneva College v. Secretary, HHS,*
  778 F.3d 422 (3d Cir. 2015) ....................................................... 15, 16

*Korte v. Sebelius,*
  735 F.3d 654 (7th Cir. 2013) .......................................................... 18

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
  591 U.S. 657 (2020) ....................................................... 1, 9, 31, 32, 33

*Pennsylvania, Dep't of Pub. Welfare v. Sebelius,*
  674 F.3d 139 (3d Cir. 2012) ........................................................... 11

*Real Alternatives, Inc. v. Secretary HHS,*
  867 F.3d 338 (3d Cir. 2017) ........................................................... 16

*SEC v. Chenery Corp.,*
  318 U.S. 80 (1943) ................................................................... 10, 11

*Sharpe Holdings v. HHS,*
  801 F.3d 927 (8th Cir. 2015) ............................................................ 15

*Spireas v. Commissioner,*
  886 F.3d 315 (3d Cir. 2018) ............................................................ 11

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) ...................................................................... 35

*United States v. Safehouse,*
  146 F.4th 315 (3d Cir. 2025) ............................................................ 18

*Zubik v. Burwell,*
  578 U.S. 403 (2016) (per curiam) ................................................. 15, 16

**Statutes:**                                                              **Page(s)**

Administrative Procedure Act,
  5 U.S.C. § 706 .......................................................................... 35

Affordable Care Act,
  42 U.S.C. § 18114..........................................................................29

Religious Freedom Restoration Act,
  42 U.S.C. § 2000bb-1 ................................................ 9-10, 13, 15-17

**Rules and Regulations:**                                                 **Page(s)**

*Religious Exemptions and Accommodations for Coverage of Certain
  Preventive Services Under the Affordable Care Act,*
  83 Fed. Reg. 57,536 (Nov. 15, 2018) (JA410)............................... passim

*Moral Exemptions and Accommodations for Coverage of Certain
  Preventive Services Under the Affordable Care Act,*
  83 Fed. Reg. 57,592 (Nov. 15, 2018) (JA465)............................... passim

**INTRODUCTION AND SUMMARY OF ARGUMENT**

As the government's opening brief explained, the expanded religious exemption and moral exemption adopted in the challenged rules are reasonable exercises of the agencies' "broad discretion to define preventive care and screenings and to create the religious and moral exemptions," *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020), and are reasonably explained. In nevertheless invalidating the rules as arbitrary and capricious on seven different grounds, the district court ignored the agencies' explanation of their policy choice, relied on factual errors, and flouted the Supreme Court's holding in *Little Sisters*.

On appeal, the States effectively abandon two of the district court's rationales and only cursorily defend two others, while injecting nearly a dozen new reasons that have even less merit. This scattershot approach fails to even engage with the final rules. The States repeatedly allege the agencies failed to consider issues that were clearly considered and challenge strawman positions not reflected in the rules.

The decision below should be reversed.

## ARGUMENT

### I.　The Religious Exemption Rule Is Reasonable And Reasonably Explained.

The agencies reasonably determined that expanded exemptions were the most appropriate policy response to religious objections to the mandate.  In addition to this "independently sufficient" reason, JA419, the agencies determined that RFRA required exemptions for those that also objected to the accommodation.  The States devote most of their briefing to the flawed idea that this *additional reason* somehow makes the religious exemption rule *less reasoned*.  This misunderstands the rule, the APA, and RFRA.  The rule aims to do more than cure ongoing RFRA violations.  The agencies made clear they were adopting the expanded exemption for discretionary policy reasons regardless of what RFRA requires.  JA418-19.  Disagreement about what RFRA requires, therefore, would not establish a successful APA claim.  In any event, the agencies correctly interpreted RFRA.

### A.　The Rule Addresses Religious Objections To The Underlying Mandate.

As the government's opening brief explained (at 12, 20, 26-27, 31-32), Section II.C.1 of the final rule expressed the "independently sufficient" determination that exemptions rather than accommodations

2

were the best policy response for all religious objections *to the underlying mandate.*  JA418-19.  Section II.C.2 added an additional rationale that exemptions were required for the subset of entities that also object *to the accommodation.*  JA420-22.  This distinction between objectors to the *mandate* and objectors to the *accommodation* is critical to understanding the final rule's RFRA discussion.  *See* Opening Br. 26-27; States Br. 85 (making same distinction).  *Compare* JA419 (discussing "substantia[l] burde[n]" from "the contraceptive Mandate"), *with* JA420 (discussing "substantial burden" from "choos[ing] between the contraceptive Mandate and its accommodation").

The States plainly disagree about Section II.C.1 and mistakenly think the entire rule is about objections *to the accommodation.*  But they obfuscate the issue and refuse to read Section II.C.1 for what it says.  They argue it is somehow post hoc rationalization to say there was a policy decision when the final rule says the agencies are exercising "discretion" and determining "exemptions are the most appropriate administrative response."  JA418.  And they argue Section II.C.1's policy decision about objections to the *mandate* cannot be independent from Section II.C.2's determination about what RFRA

3

requires for objections to the *accommodation*—when the rule says the contrary, JA419.

The final rule is clear. The agencies chose to provide exemptions as a "straightforward" response to religious objections to *the mandate*, regardless of whether RFRA required exemptions for objections to *the accommodation*. JA418-19. That policy decision is reasonable and reasonably made. The States' attempts to read that decision out of the final rule lack merit.

### 1.    Section II.C.1 Explained An "Independently Sufficient" Policy Rationale.

Section II.C.1 explains the agencies' policy choice about how to treat objections *to the underlying mandate*:

> [A]n expanded exemption rather than the existing accommodation is the most appropriate administrative response to the substantial burden identified by the Supreme Court in *Hobby Lobby*.

JA419. Of course, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726-36 (2014), involved "the coverage Mandate itself, apart from the accommodation." JA420. Similarly, Section II.C.1's opening sentence says "exemptions are the most appropriate administrative response to the religious objections that have been raised," JA418, which includes

4

(*see* States Br. 85) objections to the underlying mandate.  When the rule instead referred to the subset of objections to the accommodation, it said so.  *See, e.g.*, JA419 ("religious objections to the accommodation"); JA419 ("some objectors").  After reiterating its focus on the substantial burden imposed by "the contraceptive Mandate" recognized in "*Hobby Lobby*," the agencies added that the "prior administration *chose* to" "eliminate that burden" "through the complex accommodation it created."  JA419. *That burden* necessarily refers to the underlying mandate, not the accommodation.  RFRA, however, did not "*prescrib[e]* the remedy" and the agencies were not constrained by "path dependence."  JA419.  The agencies could instead "choose … expanded exemptions … to eliminate the substantial burden imposed by the Mandate."  JA419.

The rest of the rules confirm Section II.C.1's focus on objections to the mandate.  The final rule defines "religious objection" to include objections to the underlying mandate, JA440-41, and summarizes the impact as "expand[ing] exemptions" for "entities … with religious objections to contraception," JA414.  The interim final rules describe the policy choice as how to best address religious "objections to contraceptive coverage," JA514, and avoid the substantial burden "the

contraceptive-coverage requirement imposes" "in the absence of any accommodation," JA521.

Finally, Section II.C.1 states a policy decision about how to treat those objections. As the title explains, the agencies are exercising "discretion to provide religious exemptions." JA418-20. Because there are different ways to alleviate the substantial burden imposed *by the underlying mandate*, the agencies have policy "discretion in determining whether the appropriate response is" an exemption or accommodation. JA419. The agencies exercised that policy discretion to make a different "choice" and "adopt an exemption," because it was "the most appropriate administrative response." JA419; *see* Opening Br. 25-29; JA416-18 (Section II.B also elaborating on policy rationale).

This policy decision is "independently sufficient" before considering that "an expanded exemption is required by RFRA for at least some objectors." JA419. And the rule easily satisfies the requirement that "the agency's explanation [be] clear enough that its path may reasonably be discerned." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

### 2.    The States' Counterarguments Lack Merit.

The States do not dispute that the rule's scope would rationally

follow from Section II.C.1's conclusion that exemptions were better

policy.[1]  They instead make three narrow points.  First, they dispute (at

67-70) whether the agencies concluded exemptions were better policy.

Second, they suggest (at 71-72) that even if the final rule explained this

policy conclusion, this Court should ignore it.  Finally, they argue (at

70-71) this policy judgment would not reflect reasoned decisionmaking.

None of these withstands scrutiny.

### i.    The States Offer No Account Of Section II.C.1.

The States' substantive responses are entirely nonresponsive.

They say (at 38, 67-68) reliance on Section II.C.1 of the final rule is

somehow "*post hoc* rationalization."  Then they collect (at 68)

statements from the rule that are entirely consistent with the agencies'

"independently sufficient" exercise of policy discretion, coupled with an

---

[1] Because the scope was determined by this policy decision, and not by what RFRA required, the States' mismatch arguments about public companies and mechanisms to assess sincerity also fail.  The relevant questions are whether those aspects of the policy decision are reasonable.  *See infra* pp. 17-21.

alternative conclusion that RFRA requires an exemption "for at least some objectors." JA419.[2]

The States then argue (at 69-70) that Section II.C.1 cannot be an independent reason because it "is responsive to 'religious objections'" or was "based on the existence of RFRA" and "a desire to protect religious beliefs." But those are non sequiturs. The agencies' policy decision about how to treat religious objections *to the underlying mandate* is by itself sufficient to sustain the rule, and that decision, while related to RFRA, is independent of the agencies' conclusion about what RFRA requires for objections *to the accommodation*. The States' argument (at 69) that the existence of mechanisms to police insincere objections shows the rule relates to RFRA suffers the same flaw.[3]

Finally, in a single sentence—with no analysis—the States assert (at 70) that the independently sufficient reason refers only to "the Agencies' determination that RFRA provided independent legal

---

[2] One quote misleadingly suggests RFRA required the exemption for all "religious employers," when the passage limits itself to a subset of "certain" entities, JA418, consistent with the "some objectors" language used elsewhere, JA419.

[3] Moreover, concerns about insincere objections are *not* limited to RFRA. *See* States Br. 55 n.13.

authority." That makes nonsense of the "independently sufficient" statement. Were Section II.C.1 somehow about authority and II.C.2 about what RFRA requires, then Section II.C.1 would not be *sufficient* without Section II.C.2. Nor can Section II.C.1 remotely be read to be solely about authority. *See supra* pp. 4-6. In addition to explaining the agencies had authority to make their policy decision—they "have *discretion in determining* … the appropriate response" to "the substantial burden identified … in *Hobby Lobby*," JA419 (emphasis added); *see* JA418 (similar)—the next sentences clearly exercise that discretion, with the agencies stating they "*have determined* that a broader exemption rather than the existing accommodation is the appropriate response." JA419 (emphasis added); *see* JA418 (similar).

Perhaps the States fail to engage with the agencies' exercise of policy discretion to revisit how to address religious objections *to the underlying mandate* because they do not think such discretion exists. They repeatedly suggest (at 55, 71, 83) agencies must select the narrowest way to address religious objections. But this "gets RFRA entirely backwards." *Little Sisters*, 591 U.S. at 703 (Alito, J., concurring). RFRA is a floor, not a ceiling, on respecting religious

9

practice.  The "least restrictive means" test applies to the government's "means of furthering [a] compelling governmental interest," not to its means of protecting religious beliefs.  42 U.S.C. § 2000bb-1(b).  The agencies remain free to revisit how to address religious objections *to the underlying mandate* and—even if the prior choice satisfied RFRA— make a different policy choice.

### ii.    The Court Should Consider The Agencies' Reasoning.

While the States acknowledge (at 68) that this Court "look[s] only to what the agency said at the time of the action," *Coinbase, Inc. v. SEC*, 126 F.4th 175, 200 (3d Cir. 2025) (alteration adopted), they make a passing suggestion (at 71-72) that this Court should instead look to how the agencies' lawyers described the rule in district court.  That suggestion is wrong for multiple reasons.

Looking to reasons given in court squarely conflicts with bedrock administrative law:  The "grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *see Coinbase*, 126 F.4th at 200.

Because this issue was actually decided below on the same basis—the agencies' reasoning in the rule—that the government seeks to rely on here, there is patently no forfeiture.  The district court analyzed the rule, JA36-37, not the government's brief (which *Chenery* forbids), and concluded "there is no rational connection between the problem the Agencies identified when they promulgated the Final Rules and the solution they chose," JA37.  The issue on appeal is thus the exact "same legal … standard" applied to the exact "same facts" (the reasoning in the final rule).  *Spireas v. Commissioner*, 886 F.3d 315, 321 (3d Cir. 2018); *see Pennsylvania, Dep't of Pub. Welfare v. Sebelius*, 674 F.3d 139, 146 (3d Cir. 2012) (holding that in APA cases this Court "appl[ies] the applicable standard of review to the underlying agency decision").

In any event, the government's district court briefing sufficiently described the agencies' reasoning.  "[A]fter reconsidering the interests served by the mandate," among other things, the government explained, the agencies "determined that an expanded exemption, rather than the existing accommodation, was the most appropriate administrative response."  Dkt. 344 at 7 (alterations adopted).  The briefing repeatedly emphasized the agencies' exercise of "judgment" about "the policy

11

interests," *id.* at 19, and explained the agencies' response was reasonable "*both as a policy matter* and to comply with RFRA," Dkt. 355, at 2 (emphasis added); *see id.* at 4 (criticizing "second-guessing of the Agencies' policy decisions").  Since the government's first substantive filing in 2017, it has quoted from what became Section II.C.1 to argue an exemption was "the most appropriate administrative response … even if RFRA does not compel it."  Dkt. 15, at 42-44; *see also* Dkt. 69, at 46; Dkt. 107-1, at 33-35.  The assertion that the government is raising this for the first time on appeal is unfounded.

### iii.    The Agencies Exercised Reasoned Decisionmaking.

The States devote a single paragraph (at 70-71) to whether the agencies' reasons for choosing exemptions over accommodations reflect reasoned decisionmaking.  The agencies' explanation was reasonable, *see* Opening Br. 25-30, and the States' criticisms are meritless.

The States begin by claiming exemptions are somehow not sufficiently "direct" because—in their view—they "swee[p] well beyond the scope of existing objections."  Br. 70.  But the States can only reach that conclusion by ignoring "object[ions] to the underlying mandate" and myopically focusing on "objections to the Accommodation."  States

Br. 85. Regardless, directness is not about scope but about how exemptions alleviate the substantial burden in a more "straightforward" way. JA419.

Nor would the rule fail to be an "effective means of satisfying all bona fide religious objectors," States Br. 70, if in addition to satisfying all those objectors, it allowed non-bona-fide objectors. (Regardless, it does not. *See infra* pp. 20-21.)

The States are similarly misguided when they say that seeking "[c]onsistency in respecting religious objections," JA416, is inconsistent with RFRA because "the relief granted should be specific to the objector, not uniformly defined by the broadest objection," States Br. 71. That misunderstands RFRA—which does not require the narrowest remedy—and ignores the agencies' policy reasons for selecting a broader remedy. *See supra* pp. 4-6, 9-10. Regardless, the agencies' point was that "institutions" with "similar" objections were "being treated differently … based solely on whether" they were insured by "a church plan." JA421; *see* JA415.

Finally, the States claim (at 70) the expanded exemption and optional accommodation are not "more workable" because the same

resources are expended *providing* the now-optional accommodation.

But what "consume[s agency] resources"—and made the old rule

unworkable—was the "regulatory process" and "persistent litigation

and negotiations" to determine *who must use* the accommodation.

JA521.  Taking the agencies out of that process is clearly more

workable.[4]

### B.    While The Court Need Not Decide The Issue, RFRA Does Require Exemptions In Some Cases.

Because the reasonable policy decision in Section II.C.1 was

"independently sufficient," this Court need not assess the alternative

rationale in Section II.C.2 that an "exemption is required by RFRA for

at least some objectors."  JA419.  The States do not dispute that vacatur

is inappropriate when an agency "would … have acted" the same way

regardless of the alleged error.  *See* Opening Br. 34 (quoting *Casino*

*Airlines, Inc. v. NTSB*, 439 F.3d 715, 717 (D.C. Cir. 2006)); *FDA v.*

---

[4] Nor is there any inconsistency (*contra* States Br. 70) in concluding entities satisfied with the accommodation will continue using it, JA450-51, and half the accommodated entities will invoke the exemption, JA451.  The agencies' assessment of the extent of discontent with the accommodation reinforces the soundness of the agencies' policy decision.  That entities satisfied with the accommodation will likely continue using it also means any scope error would be harmless.  *See* Opening Br. 29.

*Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 590 (2025).  And the States have no meaningful response to the agencies' clear statement they were adopting the rule "even if RFRA does not compel" it.  JA418. The agencies acted in the shadow of the circuit split left unresolved by *Zubik v. Burwell*, 578 U.S. 403 (2016) (per curiam), and reasonably decided to put that split—and years of litigation—behind them by promulgating what they considered appropriate policy regardless of how that split was eventually resolved. *See* JA419 (expressing a "desire to bring to a close the more than five years of litigation").

The States nevertheless devote a substantial portion of their brief (at 59-67) to relitigating that circuit split.  The States prefer this Circuit's vacated opinion in *Geneva College v. Secretary, HHS*, 778 F.3d 422 (3d Cir. 2015).  As explained in the agencies' rule and opening brief (at 35-40), the Eighth Circuit's vacated opinion in *Sharpe Holdings v. HHS*, 801 F.3d 927 (8th Cir. 2015), is correct.

Separate from this decade-old circuit split, the States argue the rule's discussion of what RFRA requires was arbitrary and capricious for three reasons.  None has merit.

15

First, the interim final rule reasonably cited *Geneva College* and not *Real Alternatives, Inc. v. Secretary HHS*, 867 F.3d 338 (3d Cir. 2017). *Contra* States Br. 63. Were *Real Alternatives* relevant (it is not), it would only be because—as the States claim (at 61)—it "reaffirmed" *Geneva College*. But the rules reasonably explained the pre-*Zubik* circuit split, JA513; JA420, and the government's views. In any event, *Real Alternatives* is not relevant. *Compare* States Br. 10-11, 62 (claiming *Real Alternatives* "ruled … that the Accommodation does not violate RFRA"), *with Real Alts.*, 867 F.3d at 344 n.2 (explaining the "accommodation … is not at issue in this litigation"); Opening Br. 40.

Second, the States' assertion that the agencies' compelling-interest conclusion inappropriately "refer[s] to the burden on religious employers" is unfounded. States Br. 65-66 (citing JA420-21). The agencies' explanation that the compelling interest standard is "demanding" because it justifies imposing a substantial burden, JA420-21, correctly describes RFRA, 42 U.S.C. § 2000bb-1(b). As does asking whether there is a "compelling interest in applying the Mandate to objecting religious employers," JA421; *see* 42 U.S.C. § 2000bb-1(b) ("application of the burden to the person … is in furtherance of a

16

compelling governmental interest"). The agencies adequately explained their conclusion that the "administrative record" failed to "meet the high threshold to establish a compelling governmental interest in ensuring that women covered by plans of objecting organizations receive cost-free contraceptive coverage through those plans." JA421.

Finally, considering whether the accommodation "was the least restrictive means" despite concluding there was no compelling interest would have been illogical. *Contra* States Br. 65-66. RFRA requires *both* (1) a "compelling governmental interest" *and* (2) that it be the "least restrictive means." 42 U.S.C. § 2000bb-1(b). Failing either prong reasonably ends the inquiry.

### C.    The Agencies Reasonably Included Public Companies.

The religious exemption rule reasonably includes any publicly traded companies that hold religious objections to contraceptive coverage. The States do not defend the district court's flawed reasoning that thinking such companies are both "possible" and "unlikely" is "logically inconsistent." JA41-42; *see* JA436.

Nor do the States dispute (at 47) that a public company holding such religious beliefs would warrant an exemption.

Instead, the States argue (at 45-47) it is *impossible* for a public company to hold religious beliefs. But they identify no authority taking that position. While they muster cases *they claim* "questioned whether [it] is … possible," Br. 46, those cases merely questioned whether it was *likely*, which is not the same. *United States v. Safehouse*, 146 F.4th 315, 320 (3d Cir. 2025) ("[E]ven 'large, publicly traded corporations' are RFRA persons, though it would be 'unlikely' for 'corporate giants' to assert such claims in the first place." (quoting *Hobby Lobby*, 573 U.S. at 717)).[5] If anything, those cases strongly suggest it is possible, *id.* ("applicability of RFRA would likely hinge on sincerity"), and certainly do not foreclose it, *Hobby Lobby*, 573 U.S. at 717 ("[W]e have no occasion … to consider RFRA's applicability to such companies."). The agencies reasonably left open the possibility that "some publicly traded entities *might* claim a religious character for their company." JA436 (emphasis added).

The States also say "the Agencies did not consider how publicly traded corporations could 'exercise religion' at all." Br. 47. But the

---

[5] *Korte v. Sebelius* refrained from deciding whether public companies "are [RFRA] 'persons,'" 735 F.3d 654, 682 & n.17 (7th Cir. 2013), which the States say "is not" "the question" here, Br. 47.

18

agencies explained that corporate decision-making "is a matter of well-established State law," and the agencies "would expect that such" religious "principles or views would have been adopted and documented in accordance with the laws of the jurisdiction under which the organization is incorporated or organized."  JA436 & n.61.

The States (at 48-49) recycle the argument that determining the views of companies is unworkable.  This was already raised against extending RFRA to for-profit companies and rejected in *Hobby Lobby*. Disagreement among shareholders is "not a problem that arises because of RFRA or that is unique to this context."  573 U.S. at 718.  "State corporate law provides a ready means for resolving any conflicts … ." *Id.*

Finally, were it impossible for public companies to have religious beliefs, the agencies' error would clearly be harmless.  The States' harmless-error paragraph (at 50) raises a different argument:  that it was irrational to create the exemption if the agencies' position is "no one needs" it.  That is the States' position, not the agencies'.  *See* JA437. Providing for a possible but unlikely scenario is reasonable.  *See* Opening Br. 42-43.

**D.**   ***Ex Post* Enforcement Mechanisms Are Reasonable.**

The States (at 55 & n.13) cursorily reiterate the district court's erroneous conclusion that the rules "lac[k] any mechanism for distinguishing sincere claims."  As the government's opening brief (at 43-44) quoted, the rules explained that "[e]ntities that insincerely … operate as if they are exempt would do so at the risk of enforcement under" multiple, specific "mechanisms," JA432; JA488.  The States do not explain why the identified mechanisms would not suffice; they simply ignore them and assert the opposite of what the rules said.

The States instead quibble (at 58-59) with the ancillary point of whether this process broke new ground (while seeming to agree it did not).  The States do not dispute that the same mechanisms that police plans' fraudulent claims to be grandfathered plans *can* police fraudulent claims for religious exemptions.  Nor do they dispute that plan recipients are notified whether contraception is covered.  *See* JA432; Opening Br. 44.  Instead, the States seem to argue that while objective criteria can be adequately addressed through *ex post* enforcement, "subjective" criteria must be treated differently and assessed *ex ante*.  Br. 58.  But they have no authority for that position,

20

which fails to engage with the agencies' reasons for concluding otherwise. *See* Opening Br. 43-44; JA432.[6]

### E.    The Agencies Reasonably Explained Their Changes of Position.

The States' arguments that the agencies failed to explain three purported changes in positions lack merit. And the States' argument based on the purported *failure* to change involves a position that was expressly changed.

1.    The States (at 77-78) repeat the district court's muddled discussion of abortifacients and again attack a straw man. The States assert—without quoting what they refer to—that the agencies took a "new position." Br. 77. As the opening brief explained (at 51-52, 52 n.9), the agencies did not. The final rules say:

> Some commenters further criticized the [agencies] for asserting in the [interim final rule] that some persons believe those possible effects are 'abortifacient.'
>
>    …

---

[6] The States' other arguments misread the sources they cite. What the agencies "did not know," Br. 54, was how many of the companies that "did not cover contraceptives before the ACA … operate based on sincerely held religious beliefs." JA424. And footnote 30 of *Hobby Lobby* (*see* Br. 56) has nothing to do with mechanisms to assess sincerity, but instead reasons why a bill was not enacted. 573 U.S. at 719 n.30.

The [agencies] do not take a position on the scientific, religious, or moral debates on this issue by recognizing that some people have sincere religious objections to providing contraception coverage on this basis. The Supreme Court has already recognized that such a view can form the basis of a sincerely held religious belief under RFRA. …

JA428; JA483. Observing that some *other people* view contraceptive methods as abortifacients—which the States do not dispute—does not take a position. Nor is it "improperly inject[ing] some commenters' religious views," States Br. 77, when those people's views matter for RFRA.

Even if the agencies could be misconstrued as taking a position on the "scientific, religious, or moral debates" about abortifacients, the States argue the agencies changed position in a *legal* debate, "backtracking from" their 2013 position that certain contraceptive methods "are not abortifacients within the meaning of federal law." Br. 77 (quoting JA659). In 2013, whether contraceptives were abortifacients affected whether that rule "violate[d] federal restrictions relating to abortion." JA659. With the expanded exemptions, those "federal restrictions" are no longer implicated, and the agencies had no occasion to reconsider that *legal* position. The States (at 78) do not

22

dispute this legal issue is irrelevant, which makes their continued assertion that the government changed position bewildering.

2.    The States then attack not just a straw man, but a position the final rules disclaimed. JA428; JA484; *see* Opening Br. 49-51. The States assert the agencies "rel[ied] on" "ambiguit[ies]" about "'whether contraception has caused certain reductions in teen pregnancy'" and then criticize the agencies for not supporting that position by "identif[ying] … evidence suggesting that contraception is ineffective at preventing pregnancy." Br. 78-79 (quoting JA428).

But the agencies did not take that position. They described "receiv[ing] comments about their discussion of the uncertain effects *of the expanded exemptions* on teen sexual activity." JA428 (emphasis added). To respond to "[m]any commenters" who "misunderstood the [agencies'] discussion of this issue"—in exactly the way the States appear to do—the agencies added the portion the States misleadingly quote:

> The [agencies] do not take a position on the empirical question of whether contraception has caused certain reductions in teen pregnancy. Rather, we note that studies suggesting various causes of teen pregnancy and unintended pregnancy in general support the [agencies'] conclusion that it is difficult to establish causation between granting

23

religious exemptions to the contraceptive Mandate and either an increase in teen pregnancies in particular, or unintended pregnancies in general.

JA428; JA484. The agencies could not have relied on a position they did not take; nor is it problematic that they did not identify evidence for a position they did not take.

When the States (at 79-81) finally address the effectiveness of the *contraceptive-coverage mandate*, they assert the agencies "provide no evidence" and "cited no study supporting any ambiguity regarding the impact of contraceptive mandates on reducing unintended pregnancy." Br. 79-80. That is puzzling given the numerous studies the agencies cited. For example, "at least one study, published by the Guttmacher Institute, concluded the Mandate has caused no clear increase in contraceptive use," JA424, including "among women at risk of unintended pregnancy," JA422. A review of "the 29 States where contraceptive coverage mandates have been imposed statewide" concluded "those mandates have not necessarily lowered rates of unintended pregnancy (or abortion) overall." JA429. Another "2015 study investigating the decline in teen pregnancy since 1991" concluded "that none of the relatively easy, policy-based explanations for the

24

recent decline … hold up very well to careful empirical scrutiny."
JA428.  Another study concluded unemployment was the biggest driver
of changes in unintended pregnancy, JA429; and two other studies
concluded that contraceptive costs did not affect unintended pregnancy,
JA429.

Challenging a position the agencies did not take and ignoring the
studies the agencies cited, the States fail to advance any cogent
argument for why the agencies' position was unreasonable.

3.    As the government's opening brief explained (at 52-53), the
agencies adequately explained their lack of certainty about "[w]hether
… an interest in health is advanced by refraining from providing
expanded religious exemptions."  JA422; *see* JA426-29; JA482-84.  The
agencies explained why they had less confidence that *the mandate*
reduced negative health effects from unintended pregnancies.  *See*
*supra* pp. 24-25.  The agencies also "cited to studies which associate
certain kinds of contraception with negative health outcomes, such as
fatal pulmonary embolism or hypertension," JA52 (citing JA427), and
other studies, such as a 2013 Agency for Healthcare Research and
Quality Report, that "discuss[ed] an association between contraceptive

25

use and increased risks of breast and cervical cancer" and "conclud[ed] there are no net cancer-reducing benefits of contraceptive use," JA427. The States level three criticisms against this lengthy discussion, but none undermines the reasonableness of the agencies' modest conclusion.

First, the States confusingly concede (at 76) that new evidence is not necessary but still criticize (at 75) the agencies for failing to identify "any new evidence." This was the district court's principal criticism of this portion of the rule, JA53, and it is patently meritless. The studies' publication dates are not material to whether the agencies adequately explained their change of position. *See* Opening Br. 53.

Second, it is both obvious and irrelevant that evidence of some contraceptives producing negative health effects fails to prove all contraceptives do. *Cf.* States Br. 75. As the States do not dispute, the mandate requires provision of even those harmful types. Information that even a subset of contraception is harmful was clearly relevant to assessing the overall effects of the mandate.

Finally, the States (at 74-75) argue the Food and Drug Administration considers contraceptives sufficiently "safe and effective" to authorize their use. But the States also concede (at 75) that "all safe

26

and effective medication will have side effects" and these should be "weigh[ed] … against the benefits." The agencies can reasonably doubt whether the net health effects justify withholding exemptions without doubting whether the drug should be legally prescribable: For the vast majority of safe drugs, the government lacks a compelling interest in mandating free coverage.

None of the States' objections to the agencies' discussion of health effects undermines the reasonableness of the agencies' position.

4.    The States also raise a new failure-to-change-position argument. The agencies previously said "houses of worship 'are more likely than other employers to employ people of the same faith who share the same objection'" to contraception. States Br. 80 n.22 (quoting JA645). The States claim the rule's discussion of health impacts would be unreasonable if that was still the agencies' position and assert that "[t]he Agencies have not abandoned that position." *Id.* But the rules expressly abandoned it:

> the [agencies] now disagree with our previous assertion that "[h]ouses of worship … are more likely than other employers to employ people of the same faith who share the same objection."

JA517 (quoting JA645); *see* JA435 (similar).

27

### F.    The Agencies Considered Every Issue The States Allege They Failed To Consider.

The district court faulted the agencies for failing to consider one reasonable alternative.  The States add three additional failure-to-consider arguments.  But the final rules considered these.

#### 1.    The Agencies Considered Reasonable Alternatives.

The States repeat the district court's erroneous conclusion that the agencies failed to "conside[r] a separate process for women of exempt employers to obtain contraception without requiring notification from employers."  Br. 87-88.  This is puzzling given the government's explanation, quoting extensively from the final rules, that "the agencies *did* consider" this.  Opening Br. 54-57.  The agencies identified "two problems" with "deliver[ing] contraceptive coverage independent and separate from the objecting employer's plan":

> First, it would effectively be an exemption … so it would not be a reason not to offer the expanded exemptions finalized in these rules.  Second, … the [agencies] are not aware of the authority, or of a practical mechanism [to do so].

JA419; *see* JA496.[7]

---

[7] This discussion adequately encompasses the specific proposal the States' footnote posits.  Br. 87 n.25.  Regardless, they fail to identify

*Continued on next page.*

The States' only response is—absurdly—that the quotes from the rule advance "an impermissible post-hoc rationalization." Br. 87. Perhaps the States object to the discussion in the government's brief (at 56) of the 2023 proposed rule. But it is not impermissibly post hoc to explain how subsequent events—here, for example, the 2023 proposed rule retaining the challenged exemption—confirm the reasonableness (even prescience) of the agencies' 2018 rationale that additional programs "would not be a reason not to offer the expanded exemptions." JA419.[8]

### 2.    The Agencies Considered Relevant Issues.

The States advance three alternative bases to affirm based on purported failures to consider aspects of the problem. None has merit.

**a.**    The States (at 83 n.23) claim the agencies failed to consider compliance with ACA Section 1554 (42 U.S.C. § 18114). But the rules extensively explained this. JA425-26; JA481. Rather than claim this explanation was inadequate, the States merely ignore it.

---

comments proposing that specific alternative, Opening Br. 56-57, which was not "obvious," States Br. 83.

[8] The alternatives for moral objections and religious objections to the accommodation are addressed elsewhere. *See supra* pp. 2-10; *infra* p. 34.

**b.** The States claim (at 73, 81-82) the agencies "fail[ed] to consider the reliance interests of the women who stood to lose contraceptive coverage"—in particular "access" to contraceptives and effects on women's health. States Br. 82. But the agencies thoroughly discussed access, JA422, JA430, and effects on women's health, JA422-30. *See* JA478-86. The States' real objection is not failure to consider, but disagreement with the agencies' conclusions, *see supra* pp. 23-27.

**c.** The States (at 57) claim the agencies failed to give "adequate account of the burdens" on third parties. By this, the States again mean the effects on women, but the agencies clearly gave an "adequate account" of these effects. Instead, this dispute is whether to call them a governmental "burden," and the agencies reasonably decided not to. An exemption means the government no longer "force[s] private parties to benefit" affected women, JA423, but that is not imposing a governmental burden. The contraceptive-coverage mandate operates on—and imposes burdens on—employers. While exemptions affect female employees, they do not impose governmental burdens on employees.

## II.    The Moral Exemption Rule Is Reasonable And Reasonably Explained.

The criticisms of the religious exemption rule that also apply to the moral exemption rule fail for the same reasons.  *Supra* pp. 20-30.

The States' moral-exemption-specific arguments lack merit.

### A.    Moral Objections Are A Permissible Factor.

The States argued below that "Congress needed to have affirmatively made moral beliefs a factor for the Agencies to properly consider them."  Dkt. 341-1 at 30.  The district court agreed, holding moral objections were an "improper facto[r]."  JA48-51.  That blatantly defies the Supreme Court's holding in *Little Sisters*.  It cannot be that agencies authorized to create moral exemptions cannot consider moral objections.  *See* Opening Br. 58-61.  The States do not even defend this reasoning on appeal.

### B.    The Rule Is Reasonably Explained.

1.    Instead, the States advance a different argument not addressed by the district court, *compare* States Br. 38-43, *with* JA48-51, attacking reasoning not found in the final rule, *see* JA465-86.  The States assert the "principal justification" for "the Moral Rule—that Congress *would have* included a moral exemption had Congress known

31

the ACA would include a contraceptive mandate"—"is not supported by any statutory evidence."  Br. 38-39.

But the agencies did not say Congress "affirmative[ly] desire[d]" a moral exemption, *id.* at 39, or "*would have* included a moral exemption," *id.* at 38 (citing JA476); *id.* at 41, 43 (similar).  The agencies merely said Congress *might have*:

> It is not clear … that, if Congress had expressly mandated contraceptive coverage in the ACA, it would have done so without providing for similar exemptions.

JA476.  This modest statement was reasonable.

Nor was that statement the "principal justification" for the moral exemption.  States Br. 38.  The agencies relied on "long-standing Congressional practice to provide … exemptions for … moral convictions … in the health care context, and specifically concerning issues such as abortion, sterilization, and contraception," JA476; *see* JA471-75; moral accommodations in other federal and state contexts, JA474; a desire to "avoid" disparity between "parallel" "religious" and "moral convictions," JA476-77; and previous litigation over moral objections, JA475.

The States' criticisms of these actual reasons are meritless and boil down to another argument that flouts *Little Sisters*:  In the States'

view, the absence of "statutory evidence," Br. 38-39—by which they mean a statutory moral exemption—is dispositive, *see* Br. 39-40, and justifies dismissing traditions of federal and state exemptions as inapplicable to the ACA's "modern statutory framework." Br. 43. But placing dispositive weight on the absence of a *statutory* exemption from a *regulatorily created* contraceptive-coverage mandate is fundamentally flawed. As the Supreme Court explained, "contraceptive coverage is not required by (or even mentioned in) the ACA provision at issue." *Little Sisters*, 591 U.S. at 663. The mandate is "a product of agency regulation." *Id.* That the States repeatedly imply (at 2, 39-41, 58, 86) contraceptive coverage is statutorily required does not make it true.

Finally, the States argue it is impermissible to "desire … uniformity" in treatment "between religious beliefs and moral convictions" "given the well-established legal distinction." Br. 19; *see id.* at 41-42, 86-87. This just reiterates their mistaken suggestions that there is a "statutory directive" to provide contraception, Br. 86, from which the agencies cannot make exceptions unless (like RFRA) there is a separate statutory basis. Moreover, the States entirely fail to engage with the agencies' explanation for why they preferred not to treat

33

"parallel objections" differently merely because they "are not specifically religious." JA476-77. The agencies did not, as the States suggest (at 4, 42), say "parallel treatment" was "require[d]," but merely that it was the better policy, JA477.

Exercising their delegated authority to decide what coverage to require and what exemptions to create, the agencies reasonably considered the long-standing tradition of accommodating moral convictions in this area, weighed anew how to address moral objections, and concluded moral exemptions were the appropriate policy.

**2.** The States also say the agencies failed to consider "provid[ing] a more limited exemption for moral object[ions]," Br. 86, but (again) simply ignore the final rule's consideration of it. *But see* Opening Br. 58 (quoting relevant discussion). The options they identify—"no moral exemptions," "only an accommodation," and, vaguely, that the exemption is "too broad," Br. 86—were all considered. The section of the final rule entitled "whether moral exemptions should exist, and whom they should cover," JA476-78, discussed these, including explaining why an "accommodation" alone would "be inadequate," JA477.

### III.   In Any Event, Universal Vacatur Was Improper.

Section 706 of the APA does not authorize universal relief.  *See* Opening Br. 62-67.  Even if vacatur were authorized, it is equitable, and "[t]he equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'"  *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025).  *But see id.* at 847 n.10 (reserving "the distinct question whether the [APA] authorizes federal courts to vacate federal agency action").

Finally, the States (at 89 n.26) wrongly suggest there is no Third Circuit authority for remand without vacatur.  *See Council Tree Commc'ns, Inc. v. FCC*, 619 F.3d 235, 258 n.13 (3d Cir. 2010) (discussing *American Iron & Steel Inst. v. EPA*, 568 F.2d 284, 310 (3d Cir. 1977)).

## CONCLUSION

For the foregoing reasons, the judgment vacating the final rules should be reversed or, at a minimum, narrowed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

SHARON SWINGLE

*s/ Derek Weiss*
DEREK WEISS

JACOB CHRISTENSEN

*Attorneys, Appellate Staff*
*Civil Division, Room 7230*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5365*
*derek.l.weiss@usdoj.gov*

March 2026

## COMBINED CERTIFICATIONS

1.      Government counsel are not required to be members of the bar of this Court.

2.      This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,499 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

3.      On March 25, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

4.      The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

5.      This document was scanned for viruses using Crowdstrike Falcon Sensor, and no virus was detected.


*s/ Derek Weiss*
Derek Weiss